STATE OF GEORGIA *v.* REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA *et al.*

No. 10365.   July 28, 1934.

*M. J. Yeomans, attorney-general, B. D. Murphy* and *J. T. Goree, assistant attorneys-general,* for plaintiff.

*Harold Hirsch, Marion Smith, Harmon W. Caldwell,* and *E. S. Ault,* for defendants.

BELL, J. (After stating the foregoing facts.)

■ The constitution of this State provides as follows: "No debt shall be contracted by or on behalf of the State, except to supply such temporary deficit as may exist in the treasury in any year from necessary delay in collecting the taxes of that year, to repel invasion, suppress insurrection, and defend the State in time of war, or to pay the existing public debt; but the debt created to supply deficiencies in revenue shall not exceed, in the aggregate, five hundred thousand dollars, and any loan made for this purpose shall be repaid out of the taxes levied for the year in which the loan is made. Civil Code (1910), § 6558. The constitution also declares that "The bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war." Civil Code (1910), § 6569. It is contended by the State that the loan contemplated by the regents is prohibited by each of these constitutional provisions. This question will involve a consideration of the legal status of the Regents of the University System of Georgia, the main defendant herein.

On January 27, 1785, the legislature passed an act relating to the university, section 3 of which was as follows: "Property vested in the university shall never be sold without the joint concurrence of the two boards, and by an act of the legislature; but the leasing, farming, and managing of the property of the university for its constant support shall be the business of the board of trustees. For this purpose they are hereby constituted a body corporate and politic, by the name of "The Trustees of the University of Georgia," by which they shall have perpetual succession, and shall and may be a person in law, capable to plead and be impleaded, defend and be defended, answer and be answered unto, also to have, take, possess, acquire, purchase, or otherwise receive lands, tenements, hereditaments, goods, chattels, or other estates, and the same to

lease, use, manage, or improve, for the good and benefit of said university; and all property given or granted to or by the government of this State for the advancement of learning in general is hereby vested in such trustees in trust as herein described." Section 8 of this act provided: "The trustees shall prescribe the course of public studies, appoint the salaries of the different officers, form and use a public seal, adjust and determine the expenses, and adopt such regulations, not otherwise provided for, which the good of the university may render necessary." Cobb's Digest, 1084, 1085. By section 1197 of the Code of 1863 it was declared: "The government of the University of Georgia, at Athens, is vested in a Board of Trustees, who are subject to the General Assembly." And in section 1198 of the same Code is what appears to be an abbreviated statement of the provisions of section 3 of the act of 1785. In section 1201 of the Code of 1863 is an enumeration of the powers of the board of trustees, which includes: "Any power usually granted to such incorporations necessary to its usefulness, and not in conflict with the constitution and laws." These same provisions are contained in the Civil Code (1910), §§ 1363, 1364, 1379(9), except that in the last-mentioned section the singular word "incorporation" has taken the place of the word "incorporations" as found in the Code of 1863. Each of these Codes was adopted by the legislature as the statute law. *Central of Georgia Railway Co.* v. *State*, 104 *Ga.* 831 (2) (31 S. E. 531, 42 L. R. A. 518); *Hall* v. *Jeffreys-McElreath Co.*, 37 *Ga. App.* 581, 587 (140 S. E. 910). In section 1282 of the Code of 1910 it is declared that "the State has an interest in the University of Georgia at Athens," and the buildings of the Technological School and other branch colleges. Various laws have been passed regarding the university, and in section 1396 of the Code of 1910 it is stated that "The various acts of the General Assembly relative to said university, in force at the time of the adoption of this Code, if not embraced herein and not inconsistent with what is so embraced, are still of force."

The petition in this case correctly alleges that the Regents of the University System of Georgia is a corporation. Section 45 of the reorganization act of August 28, 1931 (Ga. L. 1931, p. 20), provides as follows: "There is hereby set up and constituted a department of the State Government of Georgia, to be known as the

Board of Regents of the University System of Georgia. The name of the corporation heretofore established and existing under the name and style, 'Trustees of the University of Georgia' . . is hereby changed to 'Regents of the University System of Georgia.'" By section 48, as in case of the former trustees, it was provided that "The government of the University of Georgia and all of its branches . . is vested in a Board of Regents." By section 61 the Board of Regents was given authority "to exercise any power usually granted to such corporation, necessary to its usefulness, which is not in conflict with the constitution and laws of this State." Considering the history of this legislation, the phrase "such corporation" was not intended to designate the particular corporation, but should be understood as referring to like corporations; that is, the Board of Regents were to exercise any power usually granted corporations of like character. It is thus seen that the Regents of the University System of Georgia is a distinct corporate entity, though controlled by a Board of Regents which is designated as a department of the State government. It is further true that the corporation, by and through the Board of Regents, exercises any power usually granted to like corporations, which is necessary to the usefulness of the particular corporation and is not in conflict with the laws of this State. So long as the board does not exercise its powers capriciously or arbitrarily, or so as to thwart the purpose of the legislature in establishing a system of university education, the board itself must determine what is necessary for the usefulness of the system, and thus will govern the University of Georgia and its several branches. The powers granted are broad and comprehensive, and, subject to the exercise of a wise and proper discretion, the regents are untrammelled except by such restraints of law as are directly expressed, or necessarily implied. The legislature does not pretend to govern the system, but has entrusted this responsibility to the Board of Regents.

The constitution makes specific reference to the university in more than one instance, but only the following need be noticed in this connection: "The trustees of the, University of Georgia may accept bequests, donations, and grants of land or other property for the use of said university. In addition to the payment of the annual interest on the debt due by the State to the university, the General Assembly shall from time to time make such appropriations

to the university and high schools as the condition of the treasury will authorize." Civil Code (1910), § 6581. Obviously this provision places no limitation upon the power of the trustees, now succeeded by the Board of Regents. It may be conceded that the State is the equitable and beneficial owner of all property now vested in the Regents of the University System, and that the corporation by that name is the holder only of the legal title; but it does not follow that the corporation may not enter into any contract which in its reasonable discretion is necessary for the usefulness of the institution, or may not incur liabilities in its own name for that purpose. Being a distinct legal entity, any such liability would be a debt of the corporation and not a debt of the State.

In *Knight* v. *State,* 137 *Ga.* 537 (73 S. E. 825), it was held that where the treasurer of one of the branch institutions deposited the funds of that institution in a bank which was a State depository and which failed, these facts did not constitute a lien in favor of the State as a sovereignty, as would have been true of funds deposited by the State in its own name. The ruling in that case was to the effect that the debt created by such deposit was a debt in favor of such educational institution as a separate legal entity. By parity of reasoning a liability incurred by such institution would have constituted a liability against the institution itself, and not against the State. In *First District A. & M. School* v. *Reynolds,* 11 *Ga. App.* 650 (75 S. E. 1060), one of the branch institutions was sued upon an open account for the price of furniture purchased for school purposes. The defendant pleaded that as a State institution it was exempt from suit, in the absence of legislative consent. In the decision in that case it was said: "A careful study of the legislation relating to the entire system of schools and colleges composing the University of Georgia would seem to indicate that it intended to make all these subsidiary institutions stand in the same relation to the State and the public as the university stands, and be subject to sue and be sued. This is the only reasonable construction to. be placed upon such legislation. The legislature could not have intended to authorize the trustees to maintain these schools, to authorize private donations to be made to them, to authorize their equipment and management, and to put the public on notice of the right to deal with them, without the necessary implication that as to these schools the State would not claim the con-

stitutional exemption from suit. If the public understood that in dealing with these schools through their boards of trustees it was dealing with the State in its sovereign capacity, and would have to resort to the legislature of the State to be paid debts created by the trustees for the purpose of equipping and maintaining the schools, both the management and usefulness of such schools would be largely impeded, if not altogether destroyed. In embarking in an enterprise which is usually carried on by private individuals or companies, it was the intention of the State to waive, as to this enterprise, its sovereign character, and to confer upon individuals the right to enforce by suit contracts made by the trustees in pursuance of the powers delegated to them by the act."

Bonds and other obligations similar to those involved in this case and proposed by State institutions have been considered by the courts of several States; and it has been generally held that if the institution is a distinct corporate entity, the resulting liabilities could not be treated as a debt of the State within the meaning of consitutional prohibitions or limitations in reference to State indebtedness. Baker *v.* Carter, 165 Okla. 116 (25 Pac. (2d) 747); Fanning *v.* University of Minnesota, 183 Minn. 222 (236 N. W. 217); Alabama State Bridge Cor. *v.* Smith, 217 Ala. 311 (116 So. 695); Caldwell *v.* Board of Supervisors, 176 La. 825 (147 So. 5); State ex rel. Black *v.* State Board, 33 Idaho, 415 (196 Pac. 201); State *v.* Regents, 32 N. M. 428 (258 Pac. 571). One exception to this general statement is to be found in the case of McClain *v.* Regents, 124 Or. 629 (265 Pac. 412), in which it was held by the Supreme Court of Oregon that while the Regents of the University of that State was a corporation, it was yet a public corporation, and that any indebtedness incurred by it would be an indebtedness of the State. Upon this particular question that decision would seem not to be in accord with the current of authority, unless a distinction should be made in view of the statutes of that State. But the court further held that since the contract under consideration called for payment out of a special fund only, it did not create a debt either against the State or the University, and thus did not contravene the constitutional limitations upon State indebtedness. In the present case, if the bonds proposed by the Regents of the Georgia System do not amount to debts against the State, a determination of the constitutional questions will not involve inquiry as

to whether they will constitute debts against the corporation itself, in the sense in which the word "debt" is used in the constitution in reference to the State, municipal corporations, counties, and political subdivisions.

The existence of the corporation known as the Trustees of the University of Georgia was a matter within the knowledge of the people in adopting the constitution of 1877. This could be presumed; but, as noted above, the university corporation was specifically mentioned in the constitution. The limitations upon the creation of State indebtedness as contained in that instrument do not apply to separate legal entities created as corporations by the State. The framers of the constitution saw fit to limit the bonded indebtedness which might be incurred by counties, cities, and other political divisions of the State, and it would seem that the omission of any limitation upon the university would imply that none of the inhibitions could be referable to that institution. Furthermore, the language of these constitutional provisions as to State indebtedness clearly indicate their applicability only to the State itself as a sovereign. The first provision as quoted above is to the effect that no debt shall be contracted by or on behalf of the State, except to supply such temporary deficit as may exist in the treasury as from delay in collecting taxes, to repel invasion, to suppress insurrection, or to defend the State in time of war. None of these exceptions could possibly be applied to an educational institution. The university corporation would never require money to repel invasion or suppress insurrection or to do any of the other things referred to in this clause of the constitution. Only the State as the sovereign entity could require funds for these purposes. The same reasoning will apply with equal force to the prohibition against increasing the bonded debt except for stated purposes.

From what has been said it is our opinion that what is intended to be done by the Regents of the University System of Georgia, through its Board of Regents, will not in any manner infringe the constitution as contended. This conclusion is not contrary to such decisions as *Renfroe* v. *Atlanta,* 140 *Ga.* 81 (78 S. E. 449, 45 L. R. A. (N. S.) 1173) ; and *Byars* v. *Griffin,* 168 *Ga.* 41 (147 S. E. 66). These and similar cases concerned questions of whether stated contracts would create debts within the meaning of the constitutional debt limitations as to counties, municipalities, and other

political divisions. If the proposed bonds here under consideration would create a debt at all, it would be a debt against the corporation governed by the Board of Regents, and not against the State. This conclusion is not based upon the terms and conditions of the particular contract. Regardless of the stipulations made, the State of Georgia could never be called upon to pay these bonds. Nor would it be under any obligation, moral or otherwise, to levy any tax for the purpose of repairing any loss that might result to the university in consequence of these transactions, if the action of the board should ultimately prove to be unwise and a loss should result. If the payment of any of these bonds from the income as pledged should by any chance cause such a drain upon the resources of the affected institution that it might be in need of increased appropriations in order to function properly as an educational unit, the State would still be under no obligation to supply the deficit, even though it might desire to do so and actually do so. Such a condition would place the State only in the same situation as if the regents should be guilty of waste or mismanagement whereby they could not function without increased appropriations. If waste and mismanagement would not create a debt against the State, the issuance of these bonds would not do so. Such a condition would be referable only to the character of the management, and would not lead to constitutional difficulties. The fact that the regents promise to make every reasonable effort to fill the new dormitories to the possible exclusion of the old, whereby the non-pledged income from dormitory fees for the use of existing buildings may be reduced, does not tend to make the bonds a debt against the State. This again is a mere matter of management, and is one falling within the discretion of the regents concerning the use of the property confided to their government.

The university corporation is not the State, or a part of the State, or an agency of the State. It is a mere creature of the State, and a debt of the creature does not stand upon a level with the creator and never can rise thereto. It is first, last, and always a debt of the creature and in no sense a debt of the creator. The "Regents of the University System of Georgia" is a corporation. The State may be likened to a stockholder. The regents are the directors. The stockholder is a separate entity from the corporation itself. The stockholder places capital or a corpus into the hands of the

corporation, and usually that alone is liable for the corporation's debts. The stockholder, being a separate and distinct person, is not liable for the debts of the corporation, even though the debts of the corporation may amount to more than the assets. This, with certain exceptions, is true of other corporations created by the State; and we see no reason why the same principle should not apply as between the corporation and the State itself. The question does not turn upon the amount of the bonds. If these bonds will constitute a debt against the State, then all purchases made by the University System, not for cash, including even the purchase of pencils, stationery, fuel, or other necessary supplies, would create debts against the State in like manner; and, more than this, it would be necessary to pay instructors and employees in advance, else a debt in violation of the constitution would be created. We can not agree that the contract is in any manner affected by the constitutional provisions referred to.

■ It is insisted that the regents are prohibited by the constitution and laws from charging matriculation, laboratory, hospital, athletic, or other student fees at any of the institutions under their control. The regents promise in the contract to make every reasonable effort to collect such fees in a total amount sufficient, with the other receipts pledged, to maintain and operate the institution to which each series of bonds is related, and to make to the trustee the payments as required for the sinking-fund and reserve-fund. Is this promise contrary to any constitutional or statutory provision? The constitution provides: "There shall be a thorough system of common schools for the education of children, as nearly uniform as practicable, the expenses of which shall be provided for by taxation, or otherwise. The schools shall be free to all children of the State, but separate schools shall be provided for the white and colored races." Civil Code (1910), § 6576. This provision applies only to "common schools," which schools are not a part of the university system. Cf. Regents of University v. Board of Education, 20 Okla. 809 (95 Pac. 429). In the main, the statutes on this subject merely repeat what is contained in the constitution concerning free common schools. Michie's Code, 1926, §§ 1551(8), 1551(118). There are some other statutes, however, which should be considered in this connection. As to industrial and agricultural schools established under the act of August

18, 1906 (Ga. L. 1906, p. 72), and amendments thereto (Civil Code of 1910, §§ 1552-1562, Michie's Code, §§ 1552-1562(12)), it was declared that "tuition in said schools shall be free." Civil Code (1910), § 1560. These schools were originally created "as branches of the State College of Agriculture, a department of the University of Georgia," and "the general board of trustees of the University" were required to exercise such supervision as in their judgment might "be necessary to secure unity of plan and efficiency in said schools." Civil Code (1910), § 1552. Each school, however, was to have its own local board of trustees for its immediate control. Certain of these schools were later converted into colleges, and at least some of the resulting institutions were to continue free tuition. Ga. L. 1924, p. 165; Ib. p. 177, § 7; Ga. L. Ex. Sess. 1926, p. 34; Ga. L. 1927, p. 161, § 8; Ga. L. 1931, p. 20. The successor colleges were brought into the university system by the reorganization act of 1931. Ga. L. 1931, p. 20, § 47. By sections 55 and 74 of that act such of these colleges as were prohibited from charging a tuition fee are still so prohibited, and this applies to the Board of Regents.

An examination of the statutes discloses that some of the other units of the present system are prohibited from charging fees for tuition. But a charge for tuition is a charge for instruction (*Linton* v. *Lucy Cobb Institute,* 117 *Ga.* 678 (2), 45 S. E. 53), and this does not include a matriculation fee. In Bouvier's Law Dictionary the word "matricula" is defined as follows: "A register in which are inscribed the names of persons who become members of an association or society. In the ancient church there was matricula clericorum, which was a catalogue of the officiating clergy, and matricula pauperum, a list of the poor to be relieved: hence, to be entered in a university is to be matriculated." In Webster's New International Dictionary, "matriculation" is defined as the act of matriculating, and to matriculate is "to enroll; to enter in a register; specif., to enter or admit to membership in a body or society, particularly in a college or university, by enrolling the name in a register; to go through the process of admission to membership, as by examination and enrollment, in a society or college." In Rheam *v.* Board of Regents, 161 Okla. 268 (18 Pac. (2d) 535), it was held that a matriculation fee was not a charge for tuition within the meaning of a statute of Oklahoma, to the effect that no tuition

should be charged by the university of that State; and in the decision other cases were cited to support this conclusion. See also State ex rel. Veeder v. State Board — Mont. — (33 Pac. (2d) 516). The constitution of this State provides that the common schools shall be "free," and to be free means that no charge of any character can be made, whether for tuition or otherwise. Accordingly it has been held by this court that a charge for matriculation can not be imposed as a condition precedent to admission to any of the common schools of this State. *Moore* v. *Brinson,* 170 *Ga.* 680 (2) (154 S. E. 141), and cit. This rule applies, however, only to such schools as are made "free," and does not prevent the exaction of a matriculation fee by such institutions as are merely prevented from charging tuition fees. The right to demand payment of hospital, laboratory, and athletic fees would clearly rest upon the same principle. There is no statute which prohibits the collection of any such fees as to any one of the institutions involved in the loan agreement, although as to some of them it may be unlawful to make a charge for tuition. The agreement, however, speaks of "other fees." The record does not show what was intended by this phrase. It does not appear that any unlawful fees are contemplated, and it will not be presumed that anything illegal is intended by the parties. *Smith* v. *DuBose,* 78 *Ga.* 413 (3 S. E. 309, 6 Am. St. R. 260); *Virginia Bridge Co.* v. *Crafts,* 2 *Ga. App.* 126 (3) (58 S. E. 322). Accordingly, we see no difficulty on account of the class of fees which the regents promise to charge for the purpose of creating a fund for the payment of these bonds.

■ As indicated in a preceding division, the constitution authorizes "The Trustees of the University of Georgia" to accept bequests, donations, and grants of property for the use of the university. Civil Code (1910), § 6581. The question has been made as to whether in view of this provision the legislature could change the corporate name to "Regents of the University System of Georgia." In the first place, the constitution here refers, not to the corporate entity, but to the members of the board of trustees. But even if this construction be incorrect, it is perfectly clear that this provision did not prohibit a change of name.

■ In view of the extensive powers granted to the corporation and to the Board of Regents, they have authority to buy land for college purposes, to construct dormitories, gymnasia, and other

necessary buildings, and to charge reasonable fees for their use. They also have power to lease the gymnasia as contemplated by the contract. Nor could it be said to be an abuse of discretion for the regents to require students to occupy, "to the maximum extent," the new buildings in preference to existing buildings, for the purpose of creating net revenues from the new buildings to be pledged for the payment of the bonds, provided the loan agreement is not otherwise illegal. The regents have the duty of deciding what is necessary for the usefulness of the various institutions; and a court of equity will not interfere with their judgment, unless it appears to be arbitrary and amounts to an abuse of discretion. *Dyer* v. *Martin,* 132 *Ga.* 445 (3) (64 S. E. 475); *Jackson* v. *State Highway Department,* 164 *Ga.* 434 (4) (138 S. E. 847).

Section 71 of the reorganization act (Ga. L. 1931, p. 26), provides that each institution of the university system shall receive the use and benefit of the property devoted to it, and in no event shall the property or assets of one institution be subject to the liabilities of any other institution. It is contended that the loan agreement would result in a violation of this statute. We can not agree to this view. On the contrary it appears from the loan agreement that the parties have very carefully guarded against any comingling of assets or funds, and also against confusion of liabilities.

■ The petition alleged that the regents "will be obligated to fix, maintain, and make every reasonable effort to collect certain rates, fees, and charges for the use of new and existing buildings and other facilities at a rate in excess of the reasonable value of the use of such buildings and facilities." This allegation was denied, and the State did not offer proof in support of it. Furthermore, the defendants introduced evidence that no unreasonable charges are being made, and that no such charges are contemplated. It will not be presumed that excessive charges will be necessary or that any such will be exacted.

■ The final question is whether the regents have legal authority to obtain the loan in accordance with the terms and conditions of the loan agreement, including the proposed pledge of the portions of the income therein specified. In the first division of this opinion we have disposed of the question whether the obligations would create a debt against the State, and in the briefs filed

for defendants it is maintained that such obligations would not even create a debt against the regents as a corporation. This for the reason that the bonds do not constitute general obligations, but are payable only out of special funds. In the view which we take of the case it is unnecessary to decide whether in these circumstances a "debt" will be created against the corporation. Whatever the nature of the particular obligation, it is our opinion that the board of regents, or the corporation as the case may be, is vested with sufficient authority to issue the bonds and to obtain the loan upon the conditions agreed upon. The buildings are to be erected on the lands of the corporation, and the title to the buildings will be in the corporation from the time of their construction, ownership by the corporation not being dependent upon any condition, not even the payment of the loan. No mortgage or other lien is created, and the only stipulation which in any manner contemplates a lien is the statement which specifies the income to be pledged. None of the other property or resources can ever be held liable, and all possible remedies must be aimed at such special income. Such remedies as the government may preserve in the agreement of indenture will, of course, be limited to the rights conferred by that instrument, which is to be in accord with the loan agreement.

As noted above, the legislature has granted general and broad powers, and these general grants will include any and all acts reasonably necessary to execute the powers expressly conferred. *Born* v. *Simmons,* 111 *Ga.* 869 (36 S. E. 956); *Bass Dry Goods Co.* v. *Granite City Co.,* 119 *Ga.* 124, 126 (45 S. E. 980); *Railroad Commission* v. *Macon Railway & Light Co.,* 151 *Ga.* 256, 258 (106 S. E. 282); *Touchstone* v. *Gormley,* 178 *Ga.* 130 (172 S. E. 335). Under the powers granted, it becomes necessary in this case to look for limitations, rather than for authority to do specific acts. There is no statute which prohibits such a transaction, nor is there any constitutional obstacle. Limited only by their proper discretion and by the constitution and law of this State, they may "exercise any power usually granted to such corporations." It has been held in other States that like institutions are authorized to issue bonds for, the betterment of the educational facilities. State *v.* Regents, supra; Bauer *v.* State Board of Agriculture, 164 Mich. 415) (129 N. W. 713); Caldwell *v.* Board of Supervisors, and Fanning *v.* University of Minnesota, supra.

Attention has been called to the provision of section 3 of the act of 1785, to the effect that "Property vested in the university shall never be sold without the joint concurrence of the two boards, and by an act of the legislature;" and to the stipulation in the loan agreement, that, "So long as any of the bonds of any series are outstanding, the borrower shall not convey or otherwise alienate the new buildings or existing buildings at the institution for the benefit of which the bonds of such series shall have been issued or the real estate on which any of the said buildings shall be located, except at a reasonable price satisfactory to and with the consent and approval of the trustee, and the government if the government shall be the holder of any of the bonds." Assuming, without deciding, that the quoted legislative restriction upon the power to sell is still the law, we do not perceive that the stipulation as quoted is in any wise in conflict therewith. It does not attempt to bind the legislature not to sell, and does not propose that the regents will do or will refrain from doing any act in conflict with this statute. It is merely an additional restriction that the regents themselves' will not "convey or otherwise alienate" without the consent and approval of the trustee, and of the government if it is still a holder of any of the bonds. A mere pledge of income would not be a pledge of "property," and could not result in a sale of "property" within the purview of section 3 of the act of 1785. *Wright* v. *Hardwick,* 152 *Ga.* 302 (109 S. E. 903) ; *Featherstone* v. *Norman,* 170 *Ga.* 370 (2 *a*) (153 S. E. 58, 79 A. L. R. 449). The defendants are not undertaking to bind the legislature against the future enactment of any laws, but are merely exercising the powers granted by existing laws. Cf. State ex rel. Veeder *v.* State Board, supra.

The record discloses no illegality with respect to any feature of the loan agreement, or in any of the undertakings promised or proposed thereby.

*Judgment affirmed. All the Justices concur.*