**PAGE, Collector of Internal Revenue, v. REGENTS OF UNIVERSITY SYSTEM OF GEORGIA.**

No. 8466.

Circuit Court of Appeals, Fifth Circuit.

Dec. 18, 1937.

HUTCHESON, Circuit Judge, dissenting.

Carlton Fox, Sp. Asst. to Atty. Gen., and M. H. Eustace, Atty., Department of Justice, of Washington, D. C., and Lawrence S. Camp, U. S. Atty., and M. Niel Andrews, Asst. U. S. Atty., both of Atlanta, Ga., for appellant.

Marion Smith, M. E. Kilpatrick, and M. J. Yeomans, all of Atlanta, Ga., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

SIBLEY, Circuit Judge.

The Board of Regents of the University System of Georgia and the corporation styled Regents of the University System of Georgia, sought an injunction against W. E. Page, as collector of internal revenue, to stop his seizure under warrants for federal taxes on admissions to intercollegiate football games during September and October, 1934, of moneys which the Regents claim. A declaratory decree settling the federal nontaxability of athletic contests held under authority of the Regents was also prayed. This court has heretofore reversed a dismissal of the bill, and has ordered it tried on its merits. Regents v. Page, Collector, 5 Cir., 81 F.2d 577. The District Court has found the allegations of the bill proven, and decreed a final injunction. This appeal followed.

Page resigned as collector pending this appeal, and afterwards died. Marion H. Allen succeeded him in office. On allegations that he was about to carry out what Page had begun, Allen was cited to show cause why he should not be made a party as successor in office under 28 U.S.C.A. § 780. Allen did not controvert the allegations of fact, but objected that the action against Page was a personal one and could not thus be made one against the office of collector and in effect against the United States. The statute referred to, so far as material to be quoted, provides: "Where, during the pendency of an action, suit, or other proceeding brought by or against an officer of the United States * * * relating to the present or future discharge of his official duties, such officer * * * ceases to hold such office, it shall be competent for the court * * * whether * * * one of first instance or an appellate tribunal, to permit the cause to be continued and maintained by or against the successor." This case is within the words of the statute. Without enlarging on its purpose and history, we apply it by ordering the successor made a party.

The appellant desires to reopen the questions whether the holders of the money distrained upon, having collected it from ticket purchasers as tax, can deny the validity of the tax when called on to pay it over; and whether injunction is an available remedy to prevent its collection. This court in its former decision held that the money was not collected as a tax, but under a peculiar contract with the ticket buyers whereby the complainants were entitled to assert ownership of it if they could prove that no tax is collectible. It was also held that under the peculiar circumstances, including that just mentioned, injunction was an available remedy. These holdings are adhered to as the law of the case. The next and great question is whether the tax is constitutionally collectible in view of the connection of the Regents with the State government. It will be well to examine first the tax and its incidence, and the status of the Board of Regents.

The tax is imposed by section 500 of the Revenue Act of 1926, 44 Stat. 91, amended by section 711 of the Revenue Act of 1932, 47 Stat. 271, 26 U.S.C.A. §§ 940–944, and is "a tax of 1 cent for each 10 cents or fraction thereof of the amount paid for admission to any place * * * to be paid by the person paying such for admission." Admissions less than 41 cents are not taxed. Exempted are "any admissions all the proceeds of which inure exclusively to the benefit of religious, educational, or charitable institutions"; but the exemption "shall not be allowed in the case of admissions to any athletic game or exhibition the proceeds of which inure wholly or partly to the benefit of any college or university (including any academy of the military or naval forces of the United States)." The tax is thus collectible on all athletic games or exhibitions of which any college or university gets all or a part of the proceeds, whether it be a football game, a track meet, or other athletic exhibition; whether an intercollegiate contest or one intra mures; and whether participated in by students or hired athletes. As applied to a State university, the tax is to be viewed not simply as one on intercollegiate football games but on all forms of athletic exhibitions to which admission exceeding 41 cents is charged. Congress expressed no special purpose to single out intercollegiate football contests for taxation. While they were the occasion of the tax before us, the legitimacy of the tax as applied to a State university involves a wider field of discussion.

The tax is laid on the purchasers of admissions, but the duty and responsibility of collecting and accounting for it is put on those selling the admissions.

Where the State and its agencies are sellers, there is thus an immediate and direct burden imposed by the federal government. But, if this burden be ignored, that laid upon the patrons of the athletic exhibition is felt by the State, for the tax tends to deter patronage. It may have to be absorbed by the State by reducing the price of admission. In the present case the football tickets were sold on a basis of $1.36 for admission and 14 cents for tax, total $1.50. It seems very probable that $1.50 was the price the public was willing and accustomed to pay, and that the 14-cent tax, if collectible, was to be absorbed by a reduction in the price.[1] The tax affects the State quite as directly as when the recipient of its bond interest has to pay a federal tax on it, Weston v. Charleston, 2 Pet. 449, 7 L.Ed. 481; or a state judge a federal tax on his salary, Collector v. Day, 11 Wall. 113, 20 L.Ed. 122; or a State waterworks superintendent a federal tax on his salary, Brush v. Commissioner, 300 U.S. 352, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428. When it is a question of the federal government burdening by taxation the governmental operations of the States, or vice versa, it is not the amount of the burden but its real existence and its possibilities that condemn the tax. This is so in this special field of constitutional law because "the power to tax involves the power to destroy," in that the *amount* of tax if the *power* be once admitted must be left to the taxing legislature; as was fully explained in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579. Whether this stringent rule peculiar to our constitutional system of double government is to be applied in any case depends upon whether the function burdened by the tax is really a governmental function or some business or proprietary enterprise customarily and normally a matter of private operation and within the usual field of taxation. See South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737; Metcalf & Eddy v. Mitchell, 269 U.S. 514, 46 S.Ct. 172, 70 L. Ed. 384; Brush v. Commissioner, supra.

■ There is a faint contention made here that higher education is not a legitimate governmental function, though common schools are admitted to be necessary to the success of a democracy. It is true that historically higher education in America was for a long period furnished by church seminaries and privately endowed and operated colleges; but this was due to the lack of public funds and not to a failure to recognize that highly educated leaders are also necessary to the success of democracy. George Washington himself urged and sought to found a college for higher education in Virginia, and Thomas Jefferson pushed the idea to fruition in Virginia's University. Even before this, Georgians were pressing the matter. The Georgia Constitution of 1777, art. 54, provided: "Schools shall be erected in each county, and supported at the general expense of the State, as the legislature shall hereafter point out." Numerous acts of the period establishing towns and counties contain provisions for schools and academies in them. When by the act of 1784 the counties of Washington and Franklin were laid out, 40,000 acres of land of the first quality were set apart "for the endowment of a college or seminary of learning." Watkins' Digest, p. 293. The following year, 1785, the University of Georgia was created and its property vested in a corporation styled "The Trustees of the University of Georgia," and its government (subject to the Legislature) was committed to the trustees and a board of visitors. The trustees, appointed by the Governor, with various changes continued till 1931, when they were succeeded by the Board of Regents, complainants here. The preamble to the ancient act, Watkins' Digest, p. 299, is an unanswerable argument for higher education as a function of democratic government. It reads in part: "As it is the distinguishing happiness of free government that civil order should be the result of choice and not necessity, and the common wishes of the people becomes the laws of the land, their public prosperity and even existence very much depends upon suitably forming the minds and morals of their citizens * * * This is an influence beyond the sketch of laws and punishments, and can be claimed only by religion and education. It should therefore be among the first objects of those who wish well to the national prosperity to encourage and support the principles of religion and morality, and early to place the youth under the forming hand of society, that by instruction they may be molded to the love of virtue and good order. Sending them

---

[1] The general exemption from the tax of admissions which inure to the benefit of religious, charitable, and educational institutions was made because Congress knew the burden would fall thus on the institutions.

abroad to other countries for their education will not answer these purposes * * * and will always be the cause of so great foreign attachments that upon principles of policy it is not admissible," etc. The University of Georgia as a seat of higher learning with branches in many parts of the State has remained imbedded in the Constitutions and the statutes of the State ever since. The State of Georgia thus came into the Federal Union with this University declared as a part of its governmental activity.

The Regents were created by the act of 1931 reorganizing the executive departments of the State. Acts·1931, p. 7.. Section 45, p. 20, is: "There is hereby set up and constituted a department of the State Government of Georgia to be known as the 'Board of Regents of the University System of Georgia.' The name of the corporation heretofore established and existing under the name and style, 'Trustees of the University of Georgia' be and the same is hereby changed to 'Regents of the University System of Georgia.'" Section 48, p. 21: "The government of the University of Georgia, and all of its branches * * * is vested in a Board of Regents." By section 50, p. 21, the board is composed of persons appointed by the Governor and confirmed by the Senate, and the Governor is ex officio a member. Section 51, p. 22, fixes their term of office, and section 59, p. 24, their pay. By section 77, p. 31, "The expense of the Board of Regents, other than that of the institutions under its control, shall be met out of a separate appropriation enacted for its maintenance and support." By sections 55 and 65, pp. 23, 25, the powers, rights, privileges, and duties of the former Board of Trustees of the University of Georgia are vested in the Regents. These provisions make it very plain that the members of the Board of Regents are public officers having power to govern the University System, and that the corporation styled Regents of the University System of Georgia is a public corporation intended to hold the title to its property and do its business. The relation of the Regents and the corporation to the State was considered in State of Georgia v. Regents, 179 Ga. 210, 175 S.E. 567, 571. These expressions occur in the opinion: "It is thus seen that the Regents of the University System of Georgia is a distinct corporate entity, though controlled by a Board of Regents which is designated as a department of the state government."

"So long as the board does not exercise its powers capriciously or arbitrarily, or so as to thwart the purpose of the Legislature in establishing a system of university education, the board itself must determine what is necessary for the usefulness of the system, and thus will govern the University of Georgia and its several branches. The powers granted are broad and comprehensive, and, subject to the exercise of a wise and proper discretion, the regents are untrammeled except by such restraints of law as are directly expressed, or necessarily implied." "It may be conceded that the State is the equitable and beneficial owner of all property now vested in the Regents of the University System, and that the corporation by that name is the holder only of legal title." That the Regents are public officers and the funds they raise are public moneys, and specifically those raised by the athletic associations such as are here involved, was emphatically declared by the Legislature in the act of 1935. Acts 1935, p. 171. There can be no doubt that the Board of Regents and the instrumentalities which they employ, including the athletic associations, are governmental agencies of education.

The last and most doubtful question is whether athletic games and exhibitions for which admission is charged can be considered a part of the governmental function of education at a State university so as to be free of federal taxation. That the Board of Regents have both at the University at Athens and the Technological School at Atlanta made physical education an integral part of the University's function, and that they authorize and supervise public exhibitions for which admission is charged as a part of the program, admits of no doubt. The formal catalogues and bulletins of both institutions set forth at length the opportunities and the requirements for physical education. At Athens all students, male and female, are required to take two years of such education, military drill for males being recognized as equivalent. One teaching degree includes sports in its curriculum, being designed to qualify graduates not only to teach in the State High Schools but to direct the physical education in such schools. In both institutions the head of the Department of Physical Education holds the office of dean of men in the faculty. Other instructors, often called "coaches," are also members of the faculty. The conduct of athletic contests and the qualifications of contest-

ants are regulated by faculty rules approved by the Regents and are related to scholastic standing. The schedule of contests for each year is approved by the faculty and by the Regents. Their details are handled at each institution by an athletic association composed of faculty members and alumni and incorporated to facilitate such business transactions as the improvement of the athletic grounds and equipment. They are wholly under control of the Regents and are their agents. The chancellor of the University System is himself president of the Athletic Association at Athens. The taxes here in question were assessed against these associations, and the pleadings of the collector insist that the associations are to be considered separate from the Regents of the University System, but that position is untenable and has been abandoned in argument. The tickets which gave rise to the tax show on their face that they were sold for the University, for they state that the University of Georgia contends that there is no liability to the tax, but the University is collecting the 14 cents as a part of the charge of admission and will retain it as such if a tax is not collectible. The money from admissions is, like all other funds of the associations, audited by the State Auditor, and as already stated was claimed specifically as the State's by the State Legislature itself in the act of 1935. The highest State governmental authority has thus ratified the use of the associations and the charge for admissions to the games as proper functions of the University.

■ *Athletics* as a formal feature of education is recent in America, aside from military and naval exercises. But the conception and practice go back at least to the ancient Greeks. The Olympic and Isthmian games were public institutions designed especially to promote physical development, and their crowns were the honors most sought after. At Athens the stadium was hard by the theater, and both were public institutions. Plato in his Republic names gymnastics as the second in the trilogy of public educational activities. The Germans today call their high schools gymnasiums. In America the acquisition of grounds for school athletics is held to be a proper educational purpose, and even to authorize condemnation of the land. Reiger v. Board of Education, 287 Ill. 590, 122 N.E. 838; State ex rel. School District v. Chelan County, 69 Wash. 189, 124 P. 484. Apparatus for football and basketball may be bought with public funds. Anderson **v.** Board of Education, 49 N.D. 181, 190 N.W. 807. Damages arising from injuries in the gymnasium and on football field are not recoverable because the activities are a part of the educational program and so a governmental function. Spencer v. School District, 121 Or. 511, 254 P. 357; Mokovich v. School District, 177 Minn. 446, 225 N. W. 292. An athletic association was held exempt from taxation because an educational institution in German Gymnastic Association v. Louisville, 117 Ky. 958, 80 S. W. 201, 65 L.R.A. 120, 111 Am.St.Rep. 287. Although the scholar for a long period looked down upon the athlete, at this time we are recurring to the ancient idea that the body cannot be neglected while educating the mind.

■ *Public contests* are not an abuse of physical education. It is true they employ but a few of the students, but they give stimulus and life to the whole athletic enterprise. "To make the team" in any athletic sport is a supreme incentive to careful and systematic effort; and to star upon it is like an Olympic crown. Great judgment is necessary to prevent the stimulus of publicity from becoming too great, lest the athletic tail be found wagging the dog of mental culture in the schools, but in principle the public exhibition of the best in athletics is not different from the school exhibitions of our boyhood or from the honors and speakerships at commencements of most colleges.

■ The contests *between colleges* in athletics are only a superlative degree of the public exhibition. They resemble the intercollegiate debates of the oratorical department; but the present public taste welcomes the former far more enthusiastically than the latter. Baseball, basketball, tennis, golf, boat-racing, field athletics as well as football, are made the subject of intercollegiate contests, but in popularity by far the greatest of these is football. But the record discloses that this was not always so, for baseball greatly overshadowed football until after the World War. The writer can remember when Field Day was the day of glory for athletes at the University.

■ The *charging of admission* to athletic contests and exhibitions does not alter their educational or their governmental status, though it adds a danger of prostitution. It is common for educational exhibitions to be financed by admission charges, which have often been also a

source of revenue to the school. School exhibitions of the older days were instances. Dramatic entertainments and public debates by students in English education, and by glee clubs in musical education, are modern instances. The income from all these at the University is audited, and the net earnings go to the institution. So it is of athletic events. The University has never had adequate support by appropriations of tax money, and has had to seek other income. It is admitted that the department of physical education could not be maintained but for admission charges. These mainly support that department, including most of the salaries, the purchase of equipment, and the improvement of the athletic fields, and they help maintain the infirmary; but there have been surpluses turned into the common fund nominally as loans but never repaid. The intercollegiate football contests at present furnish by far the greater part of this income. The admission charges authorized by the Regents (and claimed by the Legislature) to any student activity, whether athletic, musical, or literary, which is recognized as a part of the educational program, and to be used wholly in its support, are in their nature a governmental arrangement for public revenue. Governments raise money by taxation, by licenses, and by selling what they have that is salable. A license may be issued as an aid to regulation under the police power, or it may be for revenue, and in both aspects it is the exercise of a governmental function. An admission ticket to an athletic exhibition held as a part of an educational program, the money to be used for the support of such education, is, when issued under authority of the State, not unlike a license. It raises money from the purchaser for a public purpose which otherwise would call for taxation. To prohibit or to tax it is an interference with legitimate governmental financing. Each student at the University and the School of Technology is charged at matriculation $10 as an athletic fee which helps support the department of physical education and entitles the student to the privileges of the gymnasium and swimming pools and athletic grounds, and to admission to all athletic events. It would hardly be supposed that these fees could be federally taxed, though they are for a seasonal admission to the University and its facilities, and within the words of the statute.

It may be conceded that for the Regents *to hire* athletes to give performances in order to make money would be taxable, for it would be for the State to enter a commercial field. In exhibitions of the State's own students there is an education of the few who directly participate in coolness and self-control under supreme excitement, in loyalty and teamwork, and a rewarding of them for faithfulness and proficiency in their physical training. There is also stimulated the interest and the efforts of all students in athletics. Between using the students in the department of physical education and hiring performers there is about the difference that existed between the Greek citizen games and the Roman gladiatorial shows. It must be admitted also that there has existed in college football a practice through the use of scholarships or other things of securing football players rather than students. This abuse has been due more to enthusiastic alumni than to college authorities, but it has in general been corrected. There can be no such charge made against the management of the Regents as exhibited in this record. The patrons of intercollegiate football games probably do not connect what they see and hear, and especially what they themselves do, with education, but that does not change the ultimate truth. There are also many problems connected with such games that have led some institutions to reject them as undesirable, but their value in the educational program is for the judgment of the educational authorities. Where the State government includes them as useful and incidentally uses them as a source of income, it is not for the federal tax officers nor for the judges to overrule their decision. Under long-established principles the United States ought not to tax these admissions, and the statute will be held not to apply to a State university.

Judgment affirmed.

HUTCHESON, Circuit Judge (dissenting).

On the former appeal of this cause I dissented [1] from the majority view that the 14-cent per ticket the athletic associations had collected from purchasers of admission tickets to intercollegiate football games, in addition to the $1.36 charged for admission, had not been collected as a tax, and that a temporary injunction would lie to prevent its summary collection. I thought then, I

---

[1] 5 Cir., 81 F.2d 577, at page 583.

think now, that the money was collected as taxes, and that without regard to whether the government or the Regents should be ultimately declared entitled to it, section 1543, 26 U.S.C.A., forbade the issuance of an injunction to restrain its collection. I therefore dissent from the conclusion of the majority on this appeal that the former opinion is the law of the case, and that injunction is an available remedy.

I dissent, too, from their conclusion that the federal tax on admissions to "any athletic game or exhibition the proceeds of which inure wholly or partly to the benefit of any college or university," may not be lawfully laid upon and collected from persons admitted to intercollegiate football games conducted under the auspices of the athletic associations of the University of Georgia and of Georgia Tech; that the government has no interest in or right to have an accounting for the moneys collected from ticket purchasers under the form of receipt employed in this case, and plaintiff is therefore entitled to a permanent injunction.

I subscribe fully to the views the majority opinion advances, that the fostering and support by the State of higher education, by the establishment and maintenance of State universities for instruction in the higher branches of learning, is not only a legitimate, but an essential, governmental function in a republic like ours. I particularly subscribe to all that is said about the distinguished part in furthering this ideal which Georgia and Georgians early took, and have persistently sustained. I could not do otherwise, for it was a Georgian, Mirabeau B. Lamar, who, by his message[2] to the first Congress of the Republic of Texas, in 1838, was instrumental in having set apart enormous grants of public lands for the maintenance and establishment of a "University of the first class." In that message he pointed out, with an eloquence which has seldom been equalled and never surpassed, the necessity to democratic institutions of the furtherance, not only of common schools, but of higher education. His inspired words, "Cultivated mind is the guardian genius of Democracy; and while guided and controlled by virtue, the noblest attribute of man. It is the only dictator that free men acknowledge, the only security that freedom desires," are the watchwords of the University system of Texas, and through its persuasive influence, of the whole educational system of that State.

I have no difficulty, either, in going along with my associates in their expressed view that general provision for instruction in, and the practice of, athletics as a formal feature of college education may be justly regarded as proper, and may be legitimately provided for out of public funds.

My associates have referred to the German Gymnasia, the Greek Olympics, the Roman games, to which catalogue might well be added the games of England's public schools and the boat races on the Thames. They have insisted that public contests are not an abuse of physical education, and that contests between colleges in athletics are only a superlative degree of the public exhibition. With all of these notions I fully agree, but with the greatest deference I submit that there is a complete non sequitur between these positions and the conclusions the majority draw: (1) That the staging and conduct of the colorful spectacles which burst into bloom in stadiums all over America in October and November of each year are a part of the governmental function of education in a State university; and (2) that, if their staging and conduct are matters of governmental concern, the collection from the attending public of an admissions tax of 14 cents a person, is such a direct burden upon the State governments as that within the applicable decisions, the government of the United States may not require the athletic asso-

---

2 * * * "It will be my leading policy * * * to lay the foundations for those higher institutions for moral and mental culture without which no government on democratic principles can prosper, nor the people long preserve their liberties. * * * If we desire to establish a republican government on a broad and permanent basis, it will become our duty to adopt a comprehensive and well regulated system of mental and moral culture. Education is a subject in which every citizen, and especially every parent, feels a deep and lively concern. It is one in which no jarring interests are involved, and no acrimonious political feelings are excited; for its benefits are so universal that all parties are cordially united in advancing it.

"It is admitted by all that cultivated mind is the guardian genius of Democracy, and while guided and controlled by virtue, the noblest attribute of man. It is the only dictator that free men acknowledge, and the only security that freedom desires."

ciations which conduct the enterprises, to collect the tax for them from purchasers attending the games.

My associates, apparently to their own satisfaction, have rationalized themselves into the frame of mind to believe and to say that these modern gladiatorial spectacles, conducted in vast and costly amphitheaters, for the excitement and amusement of the American public, all present being keyed to a pitch and under a tension wholly foreign to that ordinarily associated with academic and educational pursuits, are an essential part of higher education in Georgia, and, as such, a governmental function of that State. They have not rationalized me into that frame of mind; I cannot rationalize myself into it. It seems to me that the mental processes by which the din and delight, the struggle and stress, the flying arms and legs, the alternate tangles and extrications, and all the heady actions of an intercollegiate football game, are envisioned as higher education, are a "reductio ad absurdum" of even modern higher educational theory. They seem to me in the slangy but expressive vernacular common in the stadiums, to "take higher education for a ride."

The writer of the majority opinion, himself a distinguished product of Georgia's educational system in the days when, as he admits, field day, and not football day, was the day of glory for athletes at the University, and education was education, points with pardonable pride to Georgia's interest in higher education, early awakened, and persistently maintained. He justly points out, too, that physical training may properly form a part of university life. With deference, he has not pointed, nor do I think he can point, to any practice, precedent, or principle upon the basis of which it can be successfully maintained that the conduct of intercollegiate football games for profit, as is now the case in the football season, may be legitimately said to be a governmental function or activity of any kind, least of all a function of higher education. I think for us to hold otherwise would be having ears, to hear not, and having eyes, to close them to what all but us can see, and this judges may not do.

In the view I take of the matter, the precise setup of a particular State University is unimportant. When the vast spectacular program of fall meetings, of which we take judicial notice, is considered, it is quite evident that from the time the football season opens in early fall, until it closes at Thanksgiving, with its post season spectacles in the Rose Bowl, the Sugar Bowl, the Orange Bowl, the Cotton Bowl, and other bowls galore, it presents a vast hippodrome, colorfully staged and segmentally divided into rings upon rings, where here one set of gladiators, there another, meet and engage in deeds of derring-do, to the frantic cheering of assembled thousands of half-mad spectators. More, on game days hundreds of thousands of radios all over the United States pick up the dramatic voices of announcers, and a portion of every program in every moving picture theater during the whole season carries on.

In such view, particular arrangements of particular colleges for obtaining performers in this vast series of spectacles, as well as particular arrangements each makes for drawing public interest and public money, fade into insignificance.

We judicially know that in the football season, from coast to coast, from Lakes to Gulf, these gigantic, commercialized activities, these intercollegiate football games, absorb the public attention, priming in interest any other form of public spectacle. We judicially know that during that period the members of the football team, at Tech there were fifty, at Georgia about the same, become men set apart. They have their own training table, their own rules. Glorified men at arms, they go abroad, the fighting men of their universities, bringing to it, if they have been well scouted, garnered and trained, fame, honor, and money galore. If they have not been, no fame, no honor, and a much smaller portion of the gate receipts.

We judicially know that in these games there is a guarantee and division of gate receipts between athletic associations of the respective colleges, and that the greater the fame and prowess of the teams, the greater the gate receipts. We judicially know that the size of the gate receipts has no relation whatever to the educational standing of the colleges, or to that of the members of the teams, but entirely to the skill and prowess of the teams in ground gaining, and to that of the individual members, the combatants on the field, in running, blocking, tackling, interfering, kicking, passing, and receiving.

We judicially know that there is quite a difference of opinion among educators and those interested in education, as to whether intercollegiate football games, as they are conducted, are in danger of degenerating into a racket, or have justified themselves. We judicially know, too, that there is no difference of informed, academic, as opposed to legalistic opinion anywhere, upon the proposition that intercollegiate games in themselves are not part of higher education, and that it is only by dint of the greatest struggles and precautions, on the part of the various conferences which govern these football games, directed toward maintaining scholastic standing and preventing professionalism in too aggravated a form, that they are conducted without great injury to the cause of higher education. But we know, too, that it is thought by many that, so managed and conducted, the money and athletic prestige gained for particular colleges by outstanding teams make the games worth the candle.

When the matters of which we take judicial notice are put to one side, and this particular record is examined, it is found to be not only teeming with evidence as to, but crying out that, the prime reason and incentive for the conduct of intercollegiate football games on the scale and in the manner on which they are being conducted by the Georgia and Tech Athletic Associations is a financial one,[3] and that, without the financial returns from them, the games, and the stadiums in which they are played, indeed the department of physical education itself, would vanish like the mists of the morning.[4]

When it is considered that the record shows that these great educational exhibitions of the higher learning, these intercollegiate football games take in, for Georgia, in an ordinary season of two months, nearly $75,000, and more than that for Tech, and of course substantially the same amount under their guarantees for the teams with which these teams compete,[5] when, in short, it is considered that in September and

[3] "Our business manager fixes the price at which we sell football tickets to any particular game. After a period of years we know about what the expenses are, what our tickets should be to meet them, that is how, we fix the admissions to the games. When I refer to expenses I mean the entire expenses of maintaining an athletic department and staging the games, for the purchase of lands, for additional fields, for the maintenance of fields, all the salaries of coaches and instructors come out of the proceeds of the funds of the Athletic Associations. The total receipts from Georgia Tech appeared to be in excess of $127,000 for the fall of 1934. This is comparable to the receipts from year to year from that source, except the boom years 1928 and 1929, the period of our greatest receipts. Our receipts were increased a great deal by $50,000 from the Rose Bowl game in California in 1929. In that year the school had an excellent team and the total receipts from football in the year were about $200,000."

[4] One of the witnesses for the University of Georgia, when questioned "What is there about the Department of Physical Education as affects participation in athletic sports that is different from any other department in the University," answered:

"The only difference is that if it were not for the receipts from athletics there would be none. No appropriation is made by the State Legislature to go to the Department of Physical Education.

If athletic contests were not carried on, we would have no Department of Physical Education."

A witness for Georgia Tech testified: "We had a baseball team in 1934. We did not have one in 1935. As to the purpose of giving up baseball activities in 1935, college baseball has fallen out. We substituted soft ball because instead of having two teams playing hard ball, we could have 30 to 50 teams playing soft ball. There is no student interest in college baseball. There is no public interest whatever in college baseball."

The President of the University of Georgia testified that they had a college baseball team but it did not pay for itself. "They had a college track team and it did not pay for itself. As to all of these intercollegiate sports that we maintain, they do not pay for themselves; only football. That is the present public taste. I can remember the time when football did not support itself, and baseball paid the best of all the sports carried on. It is only since the world war, when people became interested in bodily contact sports, that it has been on a paying basis.

"I regret to say that we could not maintain the physical education we have in athletics without charging for football games."

[5] The record does not show the amounts of these guarantees, but the audit contains a statement that, instead of showing these guarantees in the total amount collected and then deducting them, only the net amounts are given.

October of each year these two colleges take from the public on admissions tickets, to be divided between themselves and their competitors, over $300,000 a year, it is at once seen that if this is education, truly education pays.

My associates seem to concede that, if the athletic associations employed or paid men to play upon the teams, if, in short, the teams and the games were not just the by-product of the higher educational process as it operates on the general Georgia student body, this would deprive the games of their higher educational quality, and subject the patrons to tax.

I cannot see this distinction. But, if it is a sound one, I think the record in this case shows sufficiently to bring it under the rule thus set, that the football squad is a special unit in the University, provided for in large part by scholarships and allowances built up and maintained by special scouting,[6] and that the intercollegiate activities of this picked and special group have no connection whatever with either the department of physical education, or the pursuit of higher learning.[7] Certainly, if they have any connection, it is so remote and indirect as that the governmental immunity which might be extended to the activities of the department of physical education as a part of higher learning, cannot extend to the public exhibitions of the prowess of college football teams. These exhibitions are, in my opinion, as little connected with governmental function, as indirect and remote, as would be the public contests of football teams recruited from employees of the various instrumentalities of the federal government, beginning with national banks, listed by appellee on page 15 of its brief. I think no one would claim that admissions to games in which football teams maintained by these various governmental activities competed for the public amusement, and the glory and financial advantage of the athletic associations of these institutions, would be exempt from a State admissions tax because the games were part of a governmental function. I cannot see how any better contention could be made against the federal tax for teams maintained by athletic associations of State schools.

Entertaining these views as to the purely business nature and character, from the standpoint of the promoters, of these exhibitions as to which the government lays a tax upon the spectators, it is natural that I should find myself unable to agree

[6] Professor Armstrong, Associate Professor of History and Economica, and Chairman of the Athletic Association, testified that at Georgia Tech they had an interest in getting good players. The general plan of Tech is to find out about them; send out questionnaires inquiring whether they are interested in football, whether they need scholarship aid; naturally coaches are interested in getting good players.

It was testified that while the athletic association does not have a department of physical education, in which a degree is granted, it contributed in 1934 around $7,500 to the general scholarship fund.

To the question of the court, "Is any such elaborate and careful effort made to ascertain the availability of students particularly qualified along intellectual lines in history, engineering or surveying, or the like?" Dr. Armstrong answered, "No, we don't make any particular effort to find these, but if a principal is as much interested in his honor students as a coach is interested in his high school honor students, he can get the same attention as a boy that is playing football."

"Q. As a matter of actual practice and experience, that is not done? A. I am afraid the principals do not take the same interest.

"Q. As I understand it, all of the effort is made toward those who have physical prowess? A. That is true of the Physical Educational Department."

"Q. Take the Department of History. Have they a separate business manager, coach, and do they keep a separate set of books, and do they have people who are employed to coach and train up special students, and do they have special ones to go out and find these students? A. No sir; there is no other department in the college that applies to other than the Social; that is not a strictly educational department."

[7] "Football is not a required subject for a degree for a student who is enrolled in the Department of Physical Education. Any student who makes the Varsity Team in Georgia or Georgia Tech and goes out and plays in either of these activities, is merely doing it voluntarily. He gets no credit for this in the University of Georgia, and in Georgia Tech there is no Department of Physical Education in which a degree is granted."

"Degrees in the Department of Physical Education are given to those who complete the course for teaching physical education."

that here is education in its higher forms, here a governmental enterprise.

But, if I could agree with my associates that there is more of higher education here than meets · the eye and ear, and that, though hidden from me, there is a subtle connection between these games and the governmental function, I still cannot agree with them that the tax is not collectible. For it seems quite plain to me that the collection from the attending public of an admissions tax of 14 cents a person is not such a direct burden upon the State government as that within the applicable decisions the government of the United States may not require the athletic associations which conduct the enterprises to collect the tax for them from purchasers attending the games.

At the risk of weakening the force of my dissent here, by taking broader ground than necessary, I might as well say that I have long believed and unsuccessfully asserted,[8] that claims of governmental immunity from taxation have in the past been too liberally granted. In my view, the test of the constitutionality of a State or Federal tax upon the operations of the United States or of the States, or the means chosen for the execution of the powers of either government, should be whether the taxing statute discriminates against the government affected, and in favor of other taxpayers. But it is by no means necessary for me to go that far here. For under the law as it is now settled by the decisions, particularly that of the United States Supreme Court in James v. Dravo Contracting Company, 58 S.Ct. 208, 82 L.Ed. ——, delivered December 6, 1937, the levying of a tax not on the State, the Universities, nor on the athletic associations, but on and to be paid by the purchasers of tickets, is not and cannot be a direct burden upon a governmental function of the State of Georgia. Indeed, it falls so indirectly and so remotely as that it cannot really be regarded in law as any burden at all. If a State tax on the gross receipts of a contractor derived from a contract between him and the United States, for the construction of locks and dams in a navigable stream, is not invalid as laying a burden upon the operations of the Federal government, certainly a federal tax upon purchasers of tickets to a football game cannot be invalid as imposing a bur-

den upon the operations of the State government.

If the Georgia and Tech Athletic Associations competed only with each other or with other State institutions, in public football exhibitions, there would still be no reason, in my opinion, for a holding that they could not be required to collect an admissions tax from purchasers of tickets to them.

When it is considered that hundreds of athletic associations of colleges and universities not conducted by States are engaged in these competitions for public favor, and that their spectators are subject to the same kind of tax, and when it is further considered that such athletic, associations take part in the very games Georgia and Tech conduct, and part of the proceeds goes to them, the claim of governmental immunity from a tax which falls uniformly on all colleges taking part in this spectacular seasonal bid for public patronage and favor seems to me strained and farfetched indeed.

I respectfully dissent.

---

8 Texas Co. v. Carmichael, D.C., 13 F. Supp. 242, 246; Therrell v. Commissioner, 5 Cir., 88 F.2d 869, 872.