## 3092.　MILLER *v.* THE STATE.

1. While a father can not lawfully kill one merely because he has had un-lawful sexual intercourse with his daughter, still he may justify the homicide by showing that it was necessary in order to prevent further acts of fornication. In a prosecution for homicide, where there is evi-dence such as to authorize the jury to find that the deceased had been maintaining illicit sexual relations with the defendant's minor unmarried daughter, and had threatened to kill the father if he interfered, and that even after the father had become apprised of what had taken place, and was taking guard to prevent the further debauching of his child, the de-fendant, in company with the daughter, came upon the deceased under such circumstances as to indicate that he was endeavoring to continue the illicit relationship, and would likely seek to do so notwithstanding the father's protest, an instruction of the court to the jury in the fol-lowing language was erroneous: "The killing, if necessary, or ap-parently so to a reasonable mind, in order to protect the daughter at the time of the killing, would be justifiable. The killing must be necessary, or apparently so, to prevent the deceased from accomplishing his purpose then and there." The qualification contained in the words "then and there" rendered the instruction erroneous.

2. There being evidence that when, just prior to the killing, the accused met the deceased and inquired of him as to his whereabouts on the night before (it appearing that the deceased had attempted to enter the bedroom of the daughter of the accused on the night before), the accused made a movement as if to draw his revolver, with which he was armed, it was error to exclude from the jury testimony to the effect that in a conversation prior to the day of the killing, when a friend had warned the deceased that he had better keep away from the house of the accused, the deceased had replied that he could shoot about as quick as the accused could. This evidence and other similar evidence, which was improperly excluded, tended to show the animus of the deceased at the time of the fatal rencounter.

3. While it is generally relevant to prove the state of a witness's feelings toward the parties to a case, still, where a witness had testified on be-half of the defendant, it was improper for the court to allow the State to prove by other persons that this witness had made certain disparag-ing remarks concerning the defendant as to matters not connected with the case on trial.

DECIDED AUGUST 4, 1911.

Conviction of voluntary manslaughter; from Telfair superior court—Judge Martin. November 7, 1910.

*W. L. & Warren Grice, C. A. Glawson, Eschol Graham,* for plain-tiff in error.

*E. D. Graham, solicitor-general,* contra.

RUSSELL, J. This record discloses one of the saddest and most mournful tragedies that have ever fallen under our observation.

An aged father, who was educating at a religious school an only daughter, the idol of his old age, was shocked by the discovery that she had been ruined. She was less than seventeen years of age. To add to the horror of the situation disclosed to the parent's consciousness was the fact that the debauching of his daughter had been frequently carried on under his own roof, and that her bedroom, which he had believed to be a retreat of innocence, was a den of pollution whose very presence disgraced his home. He was forced to realize that the fair daughter, whose purity and grace might have served to counterbalance his own shortcomings, lived only to bring his gray hairs to the grave in disgrace, and that her very life was but a living death. He slew the man, and for this homicide was convicted and sentenced for voluntary manslaughter. The writ of error protests the judgment refusing a new trial.

Whatever the bent of our natural human sympathies, or however much as individuals we might be surprised at the verdict of a jury which would condemn a father to penal servitude for slaying the seducer of his daughter in a case where there was unimpeached evidence supporting the presumption that nothing but death would discontinue the adulterous relations, still we should not be at all disposed to interfere with the judgment if it was plain that the verdict of guilty was rendered by the jury—as it might have been—because the testimony upon this point in justification of the homicide was disbelieved; this for the reason that there might be no theory deducible from the evidence credited by the jury under which the defendant could be held to be wholly blameless in slaying the deceased. In other words, where a jury, with full cognizance and exact knowledge of the law, reach a verdict with evidence to support it, this court can not interfere. But whenever it appears that the verdict of the jury (who must receive the law from the court) may not have been due to disbelief of testimony or to the choice of one view of the evidence in preference to another view, and was likely the result of a misapprehension of the law, directly traceable to the absence of instruction or to erroneous instructions, then a new trial is required. Every defendant who is convicted of crime, where material instructions pertinent to his defense are withheld or erroneously presented, must be presumed to have been injured and deprived of his rights, if evidence which would have authorized his acquittal was submitted upon the trial.

After a very painstaking review of the record in this case, we are of the opinion that the judgment refusing a new trial was error. There is no "unwritten law" in this State in criminal cases. The application of any so-called "unwritten law" in the trial of a criminal case is itself a rape upon justice. However, the right of a parent to protect his child's virtue is plainly written in our law, and, so far from being confined to a present injury, the law lengthens the father's arm to protect his helpless offspring from impending danger. The right of protection is valueless if it exists only for the present, when all the world can see that the danger, though not immediately present, is just ahead and must be prevented, or disaster will ensue. The duty of protection is not performed, unless all is done to render protection effective. A father is not only charged with the duty of protecting his minor child, but is responsible to society for the child's conduct during minority, and entitled, as a matter of law, to control it for the protection of society and of the child alike.

The charge of the trial judge in the present case was in many respects well-nigh perfect, but it failed to submit to the jury the right of a father to protect his minor daughter from continued adulterous relations with the man who had seduced her, if the jury believed that this protection, in the particular circumstances of the case, would be an instance standing upon a like footing of reason and justice with the defense of her life or of his own; and the judge restricted the right of such protection by instructing the jury that the father would only have had the right to kill the deceased if he had reason to believe that the act of fornication was to be committed at the time and place of the killing—"then and there." According to the testimony, two distinct defenses were available to the defendant and were raised by him—the defense of his own person against an apparent attempt on the part of the deceased to shoot him with a pistol, and the defense of his immature child against further defilement at the hands of one whose boastfulness of the ruin he had wrought, though unknown to the father, left little reason for doubt that he would continue the pursuit of the object of his lust, and finally work her irretrievable ruin.

We shall not attempt to recapitulate the several assignments of error contained in the thirty-nine grounds of the amended motion for new trial, because, in so far as the exceptions taken are mer-

itorious, all of them appear to turn upon the doctrine of actual self-defense, or the right of a parent to protect his child; and this is true whether the assignment of error relates to the exclusion or the admission of testimony, or the refusal of requisite instructions, or the giving of instructions alleged to be erroneous. The charge of the court upon every feature of the case, so far as the right of the defendant to defend himself is concerned, is not only without error, but is a model presentation of the law as applicable to the case. It is so clear, so full, and so manifestly fair to the defendant as to leave no ground for complaint. We think, however, that the court erred as to this branch of the case in rejecting testimony sought to be adduced by the defendant which tended to show the probable intention of the deceased with reference to the pistol which, according to the testimony in behalf of the defendant, he attempted to draw. These sayings of the deceased, though not communicated to the defendant, were competent for the purpose of illustrating the quo animo of the deceased's act in reaching for his pistol. Previous statements of one who participates in a rencounter may be used for the purpose of comparing what he actually did with what he himself stated he intended to do, in order to enable the jury to determine what his intentions were in the act which he actually did or attempted to do. It was most material to the defendant in this case to corroborate his statement and the testimony to the effect that the deceased attempted to draw a pistol before he fired the fatal shot, and to that end he could show that the deceased had threatened to kill him if he ever interfered with the illicit relations with his daughter. The testimony that he had made such threats was relevant to this very matter, and therefore admissible. For the same reasons the declarations of the deceased as to his improper relations with a woman, easily identifiable by the circumstances as being the defendant's daughter, were admissible.

We think also that the court erred in permitting counsel for the State to examine one of the witnesses, over the defendant's objections, as to statements alleged to have been previously made by that witness, tending to discredit the witness by raising the inference that he had been unduly influenced, and laying the foundation for impeaching him by proof of contradictory statements in regard to matters immaterial to the issue on trial. In every judicial investigation great latitude should be allowed in the inquiry

and search for truth, and especially should the right of cross-examination, thorough and sifting, not be abridged; but the scope of inquiry should not be permitted to extend to the introduction of irrelevant testimony, the only reasonable effect of which must be to create prejudice against one of the parties.

In the present case the witness Parker was introduced by the defense for the purpose of testifying to threats made by the deceased against the life of the defendant, and testified that he had a conversation upon one occasion with the deceased, in which the latter said that he did not like old man Miller, and that if he ever said anything out of the way to him he was going to kill him, or if he ever said anything about his daughter he was going to kill him. This witness was permitted to testify, without objection, that he did not tell the defendant about the conversation until about two months after the killing, and that he at one time lived with the defendant, but moved away, and after the killing moved back to Miller's place. Upon cross-examination, and over the defendant's objection, the witness was interrogated as to certain language which indicated great bias on the part of Parker against the defendant, as a means of discrediting his testimony and impeaching him before the jury. The witness was asked if he had not had a previous conversation with Jim Doughty, in which he stated that he had moved away from old man Miller's place to keep from killing Miller, or to keep Miller from killing him, and that he wanted Miller hung and buried standing on his head, and that he would give the prosecutor $10 to help hang the defendant. The witness Parker denied ever having had such conversation, or that he ever made such statement, and thereupon the State introduced witnesses who swore, for the purpose of impeaching Parker, that he had in their presence a conversation in which he used the language which he denied he had uttered.

It is clear that this testimony was not relevant, and that the prior conversation was not admissible. It would have been competent for the State to show any motive that would tend to discredit the witness in the eyes of the jury. The witness could have been asked as to the state of his feelings toward the defendant, but this could not be shown by hearsay; nor could the witness be impeached by the proof of contradictory statements as to matters immaterial. The court went even further than this, and allowed the State to

prove that the witness Parker had made broader statements than those with reference to which he had been interrogated. We think that the witness Parker should at least have been asked, first, the state of his feelings toward the defendant; and if it was stated that they were good, it then might have been shown that his testimony was procured or influenced by corrupt motives; but it was not competent to go into the details of the conversation.

As to the second branch of the defendant's case, the instructions of the court were defective, in that the jury were not told, as the defendant requested they should be, that if the defendant, having just learned of the seduction of the daughter before he encountered the deceased in the road, and having knowledge that the place where he (the decedent) then sat in his buggy was an accustomed meeting place of the guilty couple, really believed that the purpose of the deceased was to continue his illicit relations with the daughter, and had good reason to believe that nothing but the death of the deceased would prevent the continuance of such relations, he had the right to kill the deceased. And, further, the jury should have been told that it was for them to consider and determine whether, under the evidence in the case, the danger of a repetition of the acts of fornication was sufficiently grave to create an instance standing upon the same footing of reason and justice as the right of actual self-defense.

The judge instructed the jury that "the killing, if necessary, or apparently so, to a reasonable mind, in order to protect the daughter at the time of the killing, would be justifiable. The killing must be necessary, or apparently so, to prevent the decedent from accomplishing his purpose then and there." We think the plaintiff in error justly complains of this charge as too greatly restricting his right to protect his daughter. The error consists in telling the jury that the defendant would only be justifiable in killing the deceased to prevent the sexual intercourse at that time and place. The act of sexual intercourse is very rarely, if ever, voluntarily committed in the presence of a third person, and the cases where participants in the sexual act are detected while in the very act of copulation are so infrequent that to say that one who would have the right to prevent the intercourse can only do so when it is about to be indulged in under his eyes would preserve only the shadow of the right and destroy its substance. According to

testimony in this case, the deceased had passed the defendant's house in his buggy earlier in the morning. It is easily inferable that he knew that this young girl would go to the commencement at Helena, and he knew the road she would have to travel, and that she would have to pass the point where he stopped his buggy. He perhaps did not know that the father would be accompanying his daughter, for this was unusual. He had been accustomed to meet her there alone. His presence at that particular time and place at least indicated an intention on his part to repeat the illicit act. The numerous notes which passed between the parties, and which are to be found in the record, give evidence that the defendant's daughter was completely under the influence of the young man, and that he was determined to continue his relations with her at any cost, even to the length of taking her father's life if the father detected the criminal intercourse.

Surely section 75 of the Penal Code, which authorizes the jury to justify a homicide if in their opinion, upon their oaths, it stands upon the same footing of reason and justice as the instances of self-defense which are previously enumerated, was not originally inserted into the body of our laws without any purpose or object. The fact that it has been inserted into every succeeding code, and stands to-day, embracing, by the universality of the word "all," every instance where a homicide has been committed, and where the circumstances of the killing may appeal to the conscience of the jury as placing it in the same category as defense of person, habitation, or property, clearly shows that it is not the legislative intention to treat this law as a dead letter. In the opinion of the writer, this code section was intended to supply the equity of the criminal law, and cover those cases where the law, by reason of its universality, is deficient. This would seem to have been the opinion of Chief Justice Lumpkin, in the *Biggs* case, 29 *Ga.* 723 (76 Am. Dec. 49), when he asked the question, " What American jury has ever convicted a man for slaying the seducer of his wife or daughter?" But, though a killing for a wrong which has been completed can not be justified, no matter how heinous the wrong, it is still justifiable to prevent certain wrongs which may be prevented, even if it cost human life to prevent their infliction. One may shoot and kill a burglar to prevent the burglar from entering his house; it is for the jury to say whether a father endowed with the

right to protect his daughter has not an equal right to prevent her continued defilement and disgrace. The principle underlying both instances is the same. The only question which could arise is, Which is the more valuable, the preservation of the chattels within the house, or the protection of its inmates? *Judgment reversed.*