## 30643. BUSBEE et al. v. GEORGIA CONFERENCE, AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS et al.

HILL, Justice.

This is a suit for declaratory judgment instituted by and on behalf of certain faculty members at institutions of the University System of Georgia seeking an adjudication that certain employment contracts entered into by the Board of Regents of the University System of Georgia are valid and binding.

The defendants are George Busbee, Governor, Johnnie L. Caldwell, Comptroller General, Gayden W. Hogan, Director of the Fiscal Division of the Department of Administrative Services, and the Board of Regents of the University System of Georgia and its members. The trial court ruled in favor of plaintiffs and the defendants have appealed.

The material facts are undisputed and relatively simple. The General Assembly met in regular session beginning in January 1975 and enacted an appropriations Act for the fiscal year commencing July 1, 1975, appropriating almost two billion dollars based upon a revenue estimate of $1,823,000,000, plus unappropriated surplus and federal revenue sharing funds (Ga. L. 1975, pp. 1333, 1486).

The Georgia Constitution prudently provides that the General Assembly shall not appropriate in any fiscal year more money than it expects to collect in revenue during the fiscal year plus that which it has on hand, unappropriated, at the beginning of the fiscal year. Code Ann. § 2-6202 (b).

The appropriations Act for the fiscal year beginning July 1, 1975 (Ga. L. 1975, p. 1333), was approved by the Governor and became effective on April 25, 1975 (Ga. L. 1975, p. 1486). It appropriated to Regents,[1] among other

---

[1] "Regents" is used herein as a nickname for simplicity. Although sounding like a group, the phrase "Board of Regents of the University System of Georgia" is also the designation of an entity of state government. *Perry v. Regents, University System,* 127 Ga. App. 42 (192 SE2d 518) (1972).

purposes, $223 million for personal services (salaries and wages) at its instructional institutions (Ga. L. 1975, p. 1449). In addition, that Act appropriated $11,510,000 for salary increases for University System personnel (academic as well as nonacademic) and approximately $44,500,000 for salary increases for certain other state employees, such increases to commence September 1, 1975 (Ga. L. 1975, pp. 1481-1483, § 44A).

Upon the Governor's approval of the appropriations Act, the Board of Regents commenced executing contracts with many of its faculty members (academic personnel) increasing their 1975-76 salaries over their 1974-75 salaries by varying amounts. When it became apparent to the Governor that the $1,823,000,000 revenue estimate for FY 1975-76 was excessive, he announced on June 18 a special session of the General Assembly which met from June 23 to July 3, 1975. The General Assembly amended the FY 1975-76 appropriations Act by reducing it by almost $125 million. Included in this reduction was the $56,000,000 state employee salary increase provision, including the $11,510,000 to fund salary increases for employees of the Board of Regents (Ga. L. 1975, Ex. Sess., pp. 1734-1886).

Plaintiffs are faculty members who received increased salary contracts between April 25, 1975, the effective date of the original FY 1975-76 appropriations Act, and July 3, 1975, the effective date of the repeal of those increases. Regents has announced that plaintiffs and other faculty members who received contracts containing salary increases will not be paid those increases but will be paid their 1974-75 salaries.

Two substantially identical suits filed in Fulton Superior Court as class actions were consolidated. Count 1 alleges that the Board of Regents has breached plaintiffs' contracts of employment for the 1975-76 academic year. Count 2 alleges that by passage of the amendment to the appropriations Act the General Assembly has enacted a law which impairs the obligation of plaintiffs' employment contracts. Count 3 alleges that Regents' failure to honor plaintiffs' contracts violates the equal protection clause of the Constitution of Georgia (Code Ann. § 2-102) in that Regents is honoring contracts

of faculty members who are teaching for the first time at a particular institution of the University System.

The trial court overruled the defendants' defense of sovereign immunity and granted the plaintiffs' prayers for relief as to all three counts. Defendants have enumerated all four rulings as error.

1. The defendants contend that they have sovereign immunity and thus are not subject to being sued. As will appear below, this question cannot be resolved by considering the defendants jointly; Regents is unique and will be considered first.

Due to the vigor with which Regents asserts its claim to soverign immunity, this point will be considered in greater depth than has occurred in recent years, but first some historical considerations are necessary.

In 1784, the General Assembly of Georgia granted 40,000 acres of land for the endowment of a state university. 4 EGL 82, Colleges and Universities, § 2. In 1785, the General Assembly created the "Trustees of the University of Georgia" and declared it to be "a person in law, capable to plead and be impleaded, defend and be defended, answer and be answered unto." Ga. L. 1785, p. 560, § 3; Cobb's Digest, p. 1084 (1851). See *State of Ga. v. Regents, University System,* 179 Ga. 210, 216 (175 SE 567) (1934).

The status of the Trustees of the University of Georgia as a "person in law, able to plead and be impleaded" was continued in the Code of 1863 (§ 1117), and the Codes of 1868 (§ 1198), 1873 (§ 1193), 1882 (§ 1193), 1895 (§ 1272), and 1910 (§ 1364).

Over the years various other schools were created by law as branches of the University of Georgia. See Ga. L. 1931, p. 7 at pp. 20-21. See also editorial notes to Code Ann. § 32-103.

In 1931, upon the recommendation of then Governor Richard Russell, the General Assembly reorganized the executive branch of state government, including the State university system. Ga. L. 1931, p. 7 and pp. 20—31. By this reorganization Act, the Regents of the University of Georgia succeeded to all the powers and duties of the Board of Trustees of the University of Georgia. Ga. L. 1931, pp. 7, 23, 25, 26 (Code Ann. §§ 32-112, 32-127, 32-

128). By this same Act, all laws governing the University of Georgia, and its Board of Trustees, were continued in effect. Ga. L. 1931, pp. 7, pp. 23, 25, 26 (Code Ann. §§ 32-112, 32-114, 32-128).

It therefore follows that upon its creation in 1931, the Regents of the University System of Georgia was a "person in law, able to plead and be impleaded." This is the historic language used to authorize a body to sue and be sued (see *First District A. & M. School v. Reynolds,* 11 Ga. App. 650, 652 (75 SE 1060) (1912)), and in fact the captions of several of the codifications cited above use the modern terms "sue and be sued." That is to say, upon its creation in 1931, Regents had express statutory authority to sue and be sued; i.e., it had no sovereign immunity at that time. *Knowles v. Housing Authority of City of Columbus,* 212 Ga. 729, 733 (95 SE2d 659) (1956).

In 1933, our laws were again codified. However, those laws relating to the University of Georgia and its numerous branches were not codified in the Code of 1933; they were simply continued in effect by that Code by its §§ 32-112, 32-114 and 32-128, supra.

Thus in 1933, the words "person in law, able to plead and be impleaded" dropped from the Code (and thus from ready visibility) but not from our law.

In 1934, in an effort to raise money to construct new buildings, the Regents sought to enter into a contract with an agency of the federal government whereby Regents would issue about three million dollars in bonds to the government, such bonds to constitute a lien upon student and athletic fees and the income from the new buildings to be built with the proceeds of such bonds. The loan agreement provided that Regents would not convey or otherwise alienate, without consent of the trustee, the new buildings or the real estate on which they were to be located so long as the bonds were outstanding. The State of Georgia sued the Regents to enjoin this undertaking, alleging that it violated, among other things, the constitutional prohibition upon the state incurring debt. In *State of Ga. v. Regents, University System,* 179 Ga. 210, 222 (175 SE 567) (1934), this court held that Regents was not the state nor an agency of the state, but was a separate corporation; that its debts were

its own and not debts of the state; and that it could enter into the agreement, encumber its property, and issue the bonds.

In 1935 the General Assembly apparently was upset by this borrowing of money because it enacted the following law (Ga. L. 1935, pp. 171, 172): ". . . 'Regents of the University System of Georgia,' is hereby declared to be a governmental agency of the State of Georgia, and all property held by said corporation under said Act of August 25, 1931, as embodied in title 32 of the Code of Georgia of 1933 is hereby declared to be the property of the State of Georgia, and subject to all the limitations and restrictions imposed upon other property of the State of Georgia by the Constitution and laws of this State. The members of the Board of Regents of the University System of Georgia, as provided for by said Act, are hereby declared to be public officers of the State of Georgia and subject, in all their actions as such, to all the limitations and restrictions imposed by the Constitution and laws of this State upon other public officers." At that same session, however, the General Assembly appropriated one million dollars to Regents for new construction. Ga. L. 1935, p. 9.

In *Ramsey v. Hamilton,* 181 Ga. 365 (182 SE 392) (1935), several citizens, taxpayers and public school teachers sued the Comptroller-General, the Treasurer and the Regents to enjoin them from paying or receiving funds under that allegedly unconstitutional statute appropriating one million dollars to Regents for new building construction. This court held that the Comptroller-General and Treasurer had sovereign immunity from such suit. Moving on to Regents, this court said (181 Ga. 378): "It is a matter of current history that the Act of 1935 from which we have quoted was adopted by the General Assembly and approved by the Governor for the purpose of changing the status and relation which the Regents of the University System of Georgia sustained to the state under the previous law, as pointed out in the decision of this court in *State v. Regents,* supra; and since the passage of that Act it is apparent that the Regents of the University System of Georgia is now, and was at the time of the filing of the

present suit, a governmental agency of the state in charge of property of which the title is in the state. It necessarily follows that a suit to restrain and enjoin that body, as prayed by the petitioners, is in effect a suit against the state, which can not be maintained against its will."

The opinion in *Ramsey v. Hamilton,* supra, does not indicate that Regents' standing as a "person in law, able to plead and be impleaded," which had been dropped from the 1933 Code, was called to the attention of the court. That opinion does not expressly hold that the 1935 Act impliedly repealed Regents' statutory power to plead and be impleaded.

Moreover, it does not appear that the 1935 Act (Ga. L. 1935, p. 171) would impliedly repeal Regents' statutory power to plead and be impleaded for the reason that the purpose of the 1935 Act was to declare Regents to be a governmental body, to declare Regents' property to be state property, and to declare Regents' members to be public officers subject to all limitations and restrictions imposed upon other public officers. That Act was not inconsistent with Regents' power to sue and be sued. "Repeals by implication are not favored by law, and a subsequent statute repeals prior legislative Acts by implication only when they are clearly and indubitably contradictory, when they are in irreconcilable conflict with each other, and when they cannot reasonably stand together." *Moore v. Baldwin County,* 209 Ga. 541, 545 (74 SE2d 449) (1953).

However, the 1935 Act was repealed in 1946, and the legislature declared that "The status of the title to the property and the status and of [sic] powers of the Regents of the University System of Georgia and of the Board of Regents are hereby restored to the full extent as if said Act has never been enacted." Ga. L. 1946, pp. 218, 219. Whatever may have been the status of Regents' immunity under the 1935 Act, in 1946 its status was restored to the full extent as if the Act of 1935 had never been enacted. See *McCants v. Layfield,* 149 Ga. 231, 234 (99 SE 877) (1919). Cf. *Warren v. Suttles,* 190 Ga. 311, 313 (9 SE2d 172) (1940).

That is to say, if it had sovereign immunity from 1935 to 1946, Regents was restored in 1946 to its power

to sue and be sued. (It is interesting to note that the Trust Company of Georgia brought suit in 1937 for construction of a will containing a bequest to the Trustees of the University of Georgia. It named certain persons as defendants but omitted Regents as successor to the Trustees of the University on the ground that Regents could not be sued. Regents successfully intervened. *Regents, University System v. Trust Co. of Ga.,* 186 Ga. 498, 502, 515 (198 SE 345) (1938). In Allen v. Regents of the University System of Georgia, 304 U. S. 439 (58 SC 980, 82 SE 1448) (1938), Regents brought suit against the Collector of Internal Revenue, and in *Harrison v. Regents, University System,* 99 Ga. App. 762 (109 SE2d 854) (1959), Regents filed a condemnation suit in Clarke County.)

Aside from the 1935 Act, which was repealed by the 1946 Act restoring Regents to its full powers as they existed prior to 1935, we have found no Act repealing the 1785 power of the Trustees of the University of Georgia to sue and be sued, which power was acquired by Regents in 1931. On the contrary, the Executive Reorganization Act of 1972, Ga. L. 1972, pp. 1015, 1066, expressly continued Regents' functions as they existed under Ga. L. 1931, p. 7.

We therefore conclude that the decision in *Regents, University System v. Blanton,* 9 Ga. App. 602 (176 SE 673) (1933), was correct albeit perhaps too narrow, and that those cases relied upon by Regents seeking to establish its claim to sovereign immunity, e.g., *Ga. Military Institute v. Simpson,* 31 Ga. 273 (1860), and *Roberts v. Barwick,* 187 Ga. 691 (1 SE2d 713) (1939), are inapplicable because here there is express legislative waiver of sovereign immunity.

Moreover, it follows from the foregoing that the State Court of Claims amendment to the Constitution (Ga. L. 1973, p. 1489) is inapplicable here because it reserved sovereign immunity except to the extent of any waiver of immunity provided by the Constitution and except "as is now or may hereafter be provided by Act of the General Assembly." The Court of Claims amendment left in existence the 1785 Act of the General Assembly.

We hold that under existing law, the Board of

Regents of the University System of Georgia is a person in law, able to sue and be sued, and that it does not have sovereign immunity in a suit for breach of the express terms of a contract which it is authorized to and has entered into.

Having concluded that Regents is subject to being sued in this case, we should not proceed immediately to the merits, thereby overlooking the defense of sovereign immunity raised on behalf of the Governor and other named defendants. Too often a finding that one public defendant is or is not subject to being sued has resulted in a like judgment against another public co-defendant, with the result that the doctrine of sovereign immunity has been misapplied. The Governor's need to be free from improper interference by litigants and the courts should not be overlooked in our desire to reach the merits of a case.

The contracts in issue here were between the plaintiffs and the Board of Regents of the University System of Georgia, an entity of state government. Regents is subject to suit in this case because it has the statutory authority to sue and be sued. The Governor is not a party to these contracts. Moreover, the Governor does not have statutory authority to enter into faculty employment contracts nor to sue and be sued thereon.

Plaintiffs urge that the Governor is subject to being sued in this suit for declaratory judgment because plaintiffs allege in Counts 2 and 3 that they have been deprived of their constitutional rights. The only thing we can find which the Governor did which has affected plaintiffs adversely was to call a special session of the General Assembly and to officially approve an amended appropriations Act omitting $11,510,000 from appropriations available to Regents. Certainly the Governor must be and is immune from suits involving his calling legislative sessions and his signing legislation passed by the General Assembly. See *Bunger v. State,* 146 Ga. 672 (2) (92 SE 72) (1917). *Undercofler v. Seaboard A. L. R. Co.,* 222 Ga. 822 (1) (152 SE2d 878) (1966), relied upon by appellees, is distinguished by its facts. Regents, not the Governor, would stand in the place of the defendant in that case.

On oral argument, plaintiffs contended that the Governor should remain a defendant in this case because his presence might be necessary in the event of affirmance and if Regents was unable to comply with the judgment. This suit involves contracts entered into by Regents. A declaratory judgment should not be affirmed as against the Governor on the ground that his presence might be necessary to effectuate the judgment. In *Mayo v. Renfroe,* 66 Ga. 408, 427 (1881), the court said regarding the Governor: "His duty in the last resort is to enforce the process of the courts. . . The idea of making him a party defendant without his consent, is inconsistent with this great duty. He is the executive of the process of the courts, as well as for the enforcement of all law generally . . ."

What has been said above regarding the Governor is equally applicable in this case to the Comptroller General and the Director of the Fiscal Division of the Department of Administrative Services. The record shows no act taken by either of them adverse to, or even relating to, the plaintiffs.

The trial court erred in overruling the defense of sovereign immunity raised by the defendants George Busbee, Johnnie L. Caldwell and Gayden W. Hogan.

2. Considering the merits, we note initially that the faculty contract forms do not contain a provision to the effect that the payments provided for therein are subject to reduction depending upon the availability of funds as provided by the appropriations Act and amendments thereto.

However, Regents and plaintiffs agree that laws in existence at the time a contract is executed are part of that contract. *McKie v. McKie,* 213 Ga. 582 (2) (100 SE2d 580) (1957).

Plaintiffs argue that the amendment to the appropriations Act eliminating faculty salary increases was not in existence at the time these contracts were executed, that the constitutional prohibition on laws impairing the obligation of contracts (Code Ann. § 2-302) was in existence, and that such appropriations Act amendment violates the Constitution and breaches the contracts.

Regents argues that our Constitution and laws (1) prohibit deficit financing, (2) restrict state expenditures to those purposes and sums specified by appropriations Acts, and (3) impose budgetary controls on the disbursement and expenditure of those funds which have been appropriated. It argues that these constitutional provisions and laws are a part of these faculty employment contracts, that the stated contract price (salary) is subject not only to the availability of public funds but is subject to their availability pursuant to an appropriations Act, that an appropriations Act is subject to being amended, and that the stated prices (salaries) in these contracts thus were subject to being amended upon determination that the revenue estimate was high.

In support of their position, Regents cites numerous provisions of our Constitution and laws but, as is often the case where numerous provisions are relied upon, no one of them is clearly in point. Regents emphasizes Code Ann. § 40-419 which provides in pertinent part that "No payment shall be made and no obligation shall be incurred against any appropriation unless such payment or obligation has been authorized as provided in this Chapter." Regents argues that, under the amended appropriations Act, these faculty salary increases now are not "authorized as provided in this Chapter" (the Budget Act). Regents does not argue that the contracts were not authorized as provided in the Budget Act at the time they were entered into. On the contrary, the "obligation" of these contracts was authorized as provided in the Budget Act at the time of their execution. In fact, Regents has not shown that the payments required by these contracts were not approved in its first quarterly allotment request made pursuant to Code Ann. § 40-415 and approved July 1, 1975.

Generally, the Budget Act provides for the approval by the Office of Planning and Budget of expenditures, not contracts. See Code Ann. §§ 40-414 through 40-417. In fact, by Ga. L. 1972, p. 910 (Code Ann. §§ 40-425 through 40-427), the General Assembly made provisions for approval of contracts in excess of $5,000, but exempted Regents' contracts and employment contracts (Code Ann. § 40-427).

Although the law prohibits a state agency from contracting to spend sums appropriated to it by an expired appropriations Act (Code Ann. § 40-420), no law or case has been cited or found which prohibits a state agency from contracting in May and June to spend in September sums to become available to it under an appropriations Act for the fiscal year beginning July 1.

Code Ann. § 40-420 provides in pertinent part that at the end of each fiscal year the amount of each appropriation remaining unexpended, and which has not been contractually obligated in writing, shall "lapse." If Regents' argument in this case were to be adopted, then the General Assembly could meet in late June and "depropriate" all sums which had been contractually obligated, by repealing the existing appropriations Act.

In *Bank of Norman Park v. Colquitt County,* 169 Ga. 534, 536 (150 SE 841) (1929), this court stated the applicable rule as follows: "[A] repealing Act will not be given a retroactive operation, so as to divest previously acquired rights, or to impair the obligation of a contract lawfully made by virtue of and pending the existence of the law repealed."

We hold that those faculty employment contracts entered into between April 25 and July 3, 1975, are valid and binding upon Regents and that nonpayment thereof according to their written salary terms constitutes a breach of such contracts.

The state can protect itself against reoccurrence of this situation in the future by contract, or by statute if that be deemed appropriate. However, persons contracting unconditionally with the state are powerless to protect themselves against depropriation of the sums contracted. This inequality may well be one of the principal reasons our Constitution provides that no law impairing the obligation of contracts shall be passed. Art. I, Sec. III, Par. II (Code Ann. § 2-302).

We therefore affirm the trial court's grant of declaratory judgment against Regents as to Count 1 of the complaint.

3. Regents contends that if there has been an impairment of plaintiffs' contracts, such impairment is constitutionally permissible, arguing that the state's

economic interests may justify some impairment of the obligation of contracts. It cites Home Building &c. Assn. v. Blaisdell, 290 U. S. 398 (54 SC 231, 78 LE 413) (1934), in which the United States Supreme Court upheld the Minnesota moratorium law enacted during the severe economic difficulties of the depression, which imposed a two year moratorium on mortgage foreclosures, at the same time requiring mortgagors to pay rent during that period.

This court declined to apply Blaisdell in *Atlantic Loan Co. v. Peterson,* 181 Ga. 266, 273 (182 SE 15) (1935), on the ground, among others, that the 1935 Georgia foreclosure Act there in issue was not temporary in nature. Again we decline to apply Blaisdell for the additional reason that no showing of economic necessity comparable to the depression of the 1930's has been made.

When the General Assembly met in special session it had decisions to make. Those choices undoubtedly were extremely difficult. However, it has not been shown that the General Assembly had no choice but to depropriate sums already committed by contracts. (As a matter of fact, it has not been shown that the General Assembly was aware of the existence of these contracts and thus it may well be that the General Assembly unknowingly depropriated contractually obligated sums.)

The amended appropriations Act provided for a total appropriation of 1.8 billion dollars, including $270 million to Regents. In fact, the amended appropriations Act increased Regents' appropriation for personal services at instructional institutions by 1.5 million dollars. By affidavit, the Treasurer and Vice Chancellor for Fiscal Affairs of the Board of Regents has testified that funds are not available to Regents consistent with the Budget Act which could be used to fund a general 5% average salary increase for academic personnel. (It should be noted that we are not here concerned with salary increases for all academic personnel; we are concerned here only with those academic personnel who obtained salary increases by written contracts.) He does not state that funds are not available to Regents consistent with the Budget Act to fund the existing

contracts. On the other hand, he does state that 6.3 million dollars for capital outlay has been "frozen" (i.e., has not been "committed"), and he points out that funds may be transferred from one budget object to another pursuant to Code Ann. § 47-516. Moreover, he states that faculty salaries may be funded from sources other than appropriated funds. Finally, he does not state the amount of the funds needed to comply with executed faculty contracts nor what efforts, if any, have been made to satisfy Regents' contractual obligations.

Under the facts of this case, we find that no economic necessity vital to the interests of the people or the state has been sufficiently shown to invoke such power as the state may have to impair the obligation of its contracts.

Moreover, we do not find that Regents is without sufficient funds to meet its contractual obligations to plaintiffs and those other faculty members who executed contracts between April 25 and July 3, 1975. That is to say, plaintiffs have failed to show that the amended appropriations Act has impaired Regents' ability to meet the obligation of these contracts.

In short, Regents' faculty contracts are valid and binding and Regents may have the necessary money to meet its obligations. If it does not have the money, it may be able to find it, or raise it, or obtain it. Until these possibilities have been exhausted, the amended appropriations Act is not subject to constitutional attack on grounds of impairment.

We therefore reverse the trial court's grant of declaratory judgment against Regents as to Count 2 of the complaint in which it held the amended appropriations Act to violate Code Ann. § 2-302.

4. In view of the foregoing, we find it unnecessary to reach and decide plaintiffs' equal protection argument.

The declaratory judgment of the trial court therefore is reversed as to the Governor, Comptroller General and Director of the Fiscal Division of the Department of Administrative Services. It is affirmed as to the Board of Regents of the University System of Georgia as to Count 1 of plaintiffs' complaint, and it is reversed as to Counts 2 and 3 of plaintiffs' complaint.

*Judgment reversed in part, affirmed in part. All the*

*Justices concur, except Jordan and Hall, JJ., who dissent.*

ARGUED NOVEMBER 18, 1975 — DECIDED DECEMBER 4, 1975 —
REHEARING DENIED DECEMBER 15, 1975.

*Arthur K. Bolton, Attorney General, Alfred L. Evans, Jr., Assistant Attorney General,* for appellants.
*Haas, Holland, Levison & Gibert, Richard G. Garrett, Theodore G. Frankel,* for appellees.

JORDAN, Justice, dissenting.

I dissent from the majority opinion for two reasons. First, in my opinion this action is barred by the doctrine of "sovereign immunity," and secondly, assuming the action is not so barred there has been no constitutionally impermissible impairment of the obligation of appellees' contracts.

1.   The doctrine of sovereign immunity has been embedded in the law of this state throughout its entire history, though judicially created and nurtured until recent years. Since it was a creature of the courts and could have been abrogated by the courts, this court and the Court of Appeals in opinions over the past 15 years have severely criticized the doctrine and urged legislative action on the question. Pursuant to such prodding, the General Assembly in 1973 submitted an amendment to the Constitution which was ratified by the electorate in 1974. Code Ann. § 2-3710. This amendment authorizes the General Assembly to create a State Court of Claims to try and dispose of cases "involving claims for *injury* or *damage"* against the state and concludes that "[n]othing contained herein shall constitute a waiver of the immunity of the state from *suit,* but such sovereign immunity is expressly reserved except to the extent of any waiver of immunity provided in this Constitution and such waiver or qualification of immunity as is now or may hereafter be provided by act of the General Assembly." (Emphasis supplied.)

It is clear from this language of the Constitution that the immunity applies to contracts as well as torts, the word "injury" being usually applied to a claim arising in

tort and the word "damage" being usually applied to a claim based on a contract. The word "suit" is all-inclusive and applicable to any type of action.

This court has had occasion to review the doctrine of sovereign immunity in the light of this amendment. In *Azizi v. Board of Regents, University System,* 233 Ga. 487 (212 SE2d 627) (1975) we said, "Because of the adoption of this constitutional amendment, and it is now effective as a part of our Constitution, we hold that the immunity rule as it has heretofore existed in this state cannot be abrogated or modified by this court. The immunity rule now has constitutional status, and solutions to the inequitable problems that it has posed and continues to pose must now be effected by the General Assembly." We further stated that the "Changes in the immunity rule, and the extent of such changes and in what circumstances, are now solely within the domain of the General Assembly of Georgia." The holding in *Azizi* was relied upon and followed in *Revels v. Tift County,* 235 Ga. 333 (1975).

In other words, it is an entirely new ball game as far as the doctrine of sovereign immunity is concerned. The General Assembly has not as yet created a State Court of Claims nor has it said what changes and the "extent of such changes and in what circumstances" shall be made in the rule. What we do know, and what this court has said in *Azizi* and *Revels,* supra, is that the doctrine now has constitutional status, and applies, in my opinion, to any "suit" involving claims for "injury" or "damage" against the state unless and until there is a waiver by Act of the General Assembly. At the present time there is simply no rational basis for making a distinction between a suit in tort and a suit in contract. Therefore the holding in *Regents, University System v. Blanton,* 49 Ga. App. 602 (176 SE 673) (1933) is no longer viable. Likewise, other opinions of the courts of this state dealing with the judicial application of the rule prior to the 1974 amendment are not applicable to claims against the state arising since the 1974 amendment.

The state in this situation has not seen "fit to disrobe itself of its sovereignty." See *Georgia Military Institute v. Simpson,* 31 Ga. 273, 277 (1860). Since the General

Assembly has taken no action which would allow or sanction an action such as is here involved, the doctrine of sovereign immunity as clearly expressed in the Constitution must be followed. The action is thus barred and the trial court erred in not so holding.

Since this dissent was written the majority opinion has been materially revised with reference to the doctrine of sovereign immunity. The original opinion held that since the Regents had authority to "contract" there was *implied* waiver of this immunity whereas the revised opinion goes back to a 1785 Act of the General Assembly as authority to show an *express* waiver of sovereign immunity. At least the majority has correctly concluded that the General Assembly can only waive sovereign immunity by a clear-cut positive expression of its intention to do so.

However, it is still my opinion that the majority has failed in its historical approach to show that Regents has been expressly stripped of its sovereign immunity. To me it is completely ludicrous to hold that the General Assembly in 1785 (when it created a private corporation to operate the University of Georgia) expressly intended to waive the sovereign immunity of the Board of Regents some 190 years later. It is indeed strange that this discovery has just been made by this court despite myriad prior cases involving Regents and its predecessors on the question of sovereign immunity. If such an express waiver can be gleaned from the language in the 1785 Act giving the trustees authority to "plead and be impleaded," then such waiver must be applied to all suits including torts and contracts. Yet the appellate courts of this state have clearly and consistently held that the Board of Regents was immune from tort actions. See *Perry & Crider v. Regents, University System,* 127 Ga. App. 42 (1) (192 SE2d 518) (1972); *Azizi v. Board of Regents,* 132 Ga. App. 384 (208 SE2d 153) (1974), cert. dismissed, and *Azizi v. Board of Regents, University System,* 233 Ga. 487 (212 SE2d 627) (1975). For the majority to be consistent in its reasoning this line of cases would have to be overruled. To do so, however, would be in utter conflict with what we said in *Azizi,* supra, to the effect that after the 1974 Amendment the "immunity

rule as it has heretofore existed in this State cannot be abrogated or modified by this court."

We point out these conflicts to emphasize the highly technical and unsound reasoning the majority has used to justify the result which has been reached. The court has abandoned the sound position it took in *Azizi,* supra, and has sunken deeper into the Serbonian bog of sovereign immunity.

2. The constitutional proscription against laws which impair the obligation of contracts is not completely inflexible. A well recognized exception to this rule is whether the exercise of the police power for the general welfare is placed above the interference or impairment of private contracts. See 16 CJS 1284, 1286, Constitutional Law, § 281.

"[W]here the police power is exercised 'for an end which is in fact public,' contracts must yield to the accomplishment of that end." Veix v. Sixth Ward Building &c. Assn., 310 U. S. 32, 41 (1940).

During the depression of the thirties, Minnesota passed an Act restricting the rights of a mortgagor to foreclose his contract in the event of default, clearly impairing the obligation of such contracts. This statute was upheld by the Supreme Court of the United States in Home Building &c. Assn. v. Blaisdell, 290 U. S. 398 (1934) where it was said, ". . . the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to the end 'has the result of modifying or abrogating the contracts already in effect.' " P. 434.

This court can take notice that this nation is in the midst of its worst depression since that time. A look at cities such as New York and nations such as Italy, England and Australia convinces us of the holocaust that can result from continuous and unbridled deficit spending. Wisely, our Constitution clearly prohibits such spending on the part of the state. Art. VII, Sec. IX, Par. II of the Constitution of the State of Georgia of 1945 (Code Ann. § 2-6202). It was clear in July of 1975 that the General Assembly had exceeded this constitutional authority by passing the General Appropriations Act of 1975, which included some $56,000,000 for raises for state

employees. On the basis of figures then available this court would have held such Act clearly unconstitutional. The Governor and the General Assembly, being aware of this constitutional infirmity, called a special session in order to amend the Act so as to conform to the constitutional mandate. Such action was clearly an exercise of the police power for the general welfare of the people of Georgia and was necessary to safeguard the vital interests of the people. The contract clause in the Constitution must be construed in harmony with the reserved power of the state to safeguard these vital interests.

Those who enter into contracts with the State of Georgia or its agencies do so with knowledge of this paramount and overriding interest of the public welfare. Under such conditions as they existed in July 1975, and continue to exist, the Governor and the General Assembly had no alternative but to amend the Act so as to bring it within the constitutional mandate against deficit spending. Any less action or no action at all would have amounted to a dereliction of the duties imposed upon them.

Under all the circumstances I am convinced that any impairment of the obligation of the appellees' contracts must yield to the laws and Constitution of this State which mandated the action on the part of the appellants in the vital interests and general welfare of the people of Georgia.

I respectfully dissent.

HALL, Justice, dissenting.

In the first majority opinion issued in this case, this court followed *Regents of the University System of Ga. v. Blanton,* 49 Ga. App. 602 (1) (176 SE 673) (1934), a headnote decision of the Court of Appeals which held that there is an implied waiver of sovereignty whenever a state enters into a contract, and it is liable for breach of that contract. On motion for rehearing the brief of the Attorney General shot down the *Blanton* decision by showing it was in direct conflict with decisions of this court running from 1971 back to 1860. E.g., *Crowder v. Dept. of State Parks,* 228 Ga. 436, 441 (185 SE2d 908) (1971); *Florida State Hospital v. Durham Iron Co.,* 194 Ga.

350, 352 (21 SE2d 216) (1942); *Roberts v. Barwick,* 187 Ga. 691 (1 SE2d 713) (1939); *Georgia Military Institute v. Simpson,* 31 Ga. 273, 277 (1860). These cases hold that "whoever contracts with the state trusts to the good faith of the state, unless the state sees fit to disrobe itself of its sovereignty." They reject the contention that the state impliedly waives state sovereignty in entering into a contract. They hold that sovereignty is only waived by "express consent of the state."

The majority of this court, however, did not give up. They could not, in intellectual honesty, overrule all the above cases and adopt the *Blanton* decision because in this very year of 1975 this court, in the following words, judicially sealed up the law of Georgia on sovereign immunity as provided by law and interpreted by this court at the time of the passage of the 1973 Court of Claims Constitutional Amendment (Ga. L. 1973, pp. 1489-1490): "Because of the adoption of this constitutional amendment, and it is now effective as a part of our Constitution, we hold that the immunity rule as it has heretofore existed in this state cannot be abrogated or modified by this court. The immunity rule now has constitutional status, and solutions to the inequitable problems that it has posed and continues to pose must now be effected by the General Assembly. The enactment of statutes by the General Assembly pursuant to this constitutional provision can, in a fair and orderly manner, eliminate the inequities and injustices that have become apparent in our modern-day society because of the rigid immunity rule." *Azizi v. Board of Regents of the University System of Ga.,* 233 Ga. 487, 488 (212 SE2d 627) (1975).

Being thus foreclosed from overruling those decisions, the new majority opinion takes a formalistic[1] canter back through the peculiar history of the Board of Regents and embraces what it finds to be talismanic words in the 1785 statute concerning the "Trustees of the

---

[1]See Llewellyn, The Common Law Tradition, Deciding Appeals, pp. 133-134 (1960); Rumble, American Legal Realism, pp. 208-210 (1968).

University System of Georgia" when that body was a private corporation. These magic words referred to in the majority opinion are that the *private* trustees are "capable to plead and be impleaded, defend and be defended, answer and be answered unto." At the time of this Act, the trustees were officers of a private corporation *without* sovereign immunity. However, even if they had had sovereign immunity I fail to see how these words could be construed to amount to an express waiver. The doctrine of sovereign immunity is a defense which must be plead. It does not spring forth every morning like the rising sun. The 1785 provision merely authorized the body of trustees to plead and defend with whatever defenses it had including the defense of sovereign immunity if it was a department of state government.

The flaw in the majority opinion is that, after declaring the lengthy legislative history of the Board of Regents and the Regents, it ignores everything therein except these "magic words." But legislation must be read as a whole: "Legislation has an aim . . . That aim, that policy is not drawn, like nitrogen, out of the air; it is evinced in the language of the statute, as read in the light of other external manifestations of purpose. That is what the judge must seek and effectuate, and he ought not be led off the trail by tests that have overtones of subjective design." Frankfurter, Some Reflections on the Reading of Statutes, 47 Col. L. R. 527, 538, 539 (1947). Cardozo's admonition was that "The meaning of a statute is to be looked for, not in any single section, but in all the parts together. . ." Panama Refining Co. v. Ryan, 293 U. S. 388, 439 (1935). Learned Hand said that the judge's task is to "try as best he can to put into concrete form what [the common] will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed." Hand, The Spirit of Liberty, 109 (1952 Ed.).

Even if we assume that the 1785 statute amounts to a waiver of sovereign immunity of any successor to the private corporation known at that time as the "Trustees of the University of Georgia," it does not follow that the Board of Regents of the University System of Georgia has been stripped of sovereign immunity, because the Board is

not the same entity as the old corporation styled "Regents." This fact was well documented in the second motion for rehearing filed in this case by the Attorney General: "What the court has concluded [in the majority opinion] is that by virtue of a 1785 statute which authorized suits against a specified 'corporation' namely 'The Trustees of the University of Georgia' (notably *not* a department of the State Government), see Ga. Laws 1785, pp. 560, 561 (Digest of the Laws of Georgia, 1755 — 1800, Marbury & Crawford), the name of which was changed in 1931 to 'Regents of the University System of Georgia' (and which in the early 30's remained a 'corporation'), (see *State of Ga. v. Regents of the University System of Ga.,* 179 Ga. 210, 216 (1934)), suits can now be maintained against an entirely dissimilar entity, the 'Board of Regents of the University System of Georgia' — which has since its inception been *a department of State government* and *not* a corporation. Ga. L. 1931, pp. 7, 20 (Ga. Code Ann. § 32-101)." Naturally, a department of state government has sovereign immunity; a mere corporation does not.

In *Perry v. Regents of the University System,* 127 Ga. App. 42 (192 SE2d 518) (1972), the Court of Appeals held that regardless of any confusion of entities ("Regents" or "Board of Regents") prior to 1945, "[the fact] [t]hat only one entity governs the state university system was made clear by the provision of the 1945 Constitution which vested the government, control and management of the system in the Board of Regents. Code Ann. § 2-6701." This principle was in no way changed by the Executive Reorganization Act of 1972 which continued the functions of both the Board of Regents of the University System of Georgia and the Regents of the University System of Georgia to whatever extent each had previously existed. Ga. L. 1972, pp. 1015, 1066. Under the 1945 Constitution the University System is operated by the Board of Regents. All property is held in the name of the Board of Regents. All actions taken on behalf of the University System are taken by the Board of Regents. The contracts in litigation here were executed in the name of the Board of Regents. In fact the suit now being decided by this court was brought against the Board of Regents. The corporation known as the Regents of the

University System of Georgia now has no substance and is nothing but a hollow shell, and the majority opinion, which relies upon the Board of Regents' being identical to and interchangeable with the Regents and upon both being corporate successors to Trustees, has thereby fallen into grave error.

In the face of all that is said above, a majority of this court has held that this litigation is controlled by the 1785 statute and its predecessor Acts relating to the old corporation known now as the Regents of the University System of Georgia and that because of those Acts the present department of state government known as the Board of Regents of the University System of Georgia has no sovereign immunity. I conclude that the Board of Regents of the University System is a department of state government with the same degree of sovereign immunity as any other department of state government. Code Ann. §§ 2-6701, 32-101.

The error of the majority opinion is that it has "grasp[ed] at a shadow while the substance escapes." Chase Nat. Bank v. United States, 278 U. S. 327, 338 (1929).

### On Motion for Rehearing.

HILL, Justice.

On motion for rehearing Regents makes certain factual assertions to the effect that it does not have the funds to meet its contractual obligations and argues that availability of funds is a condition precedent to give effect to plaintiff faculty members' contracts. What Regents overlooks is that these funds were available when these contracts were executed, as pointed out in Division 2 of the opinion holding the contracts valid.

The question of present availability (i.e., under the amended appropriations Act) relates to the showing necessary for plaintiffs to be able to challenge the constitutionality of the amended appropriations Act and to Regents' argument that it is justified in impairing the obligation of its contracts, as pointed out in Division 3 of the opinion. Until the plaintiffs are in a position to challenge the validity of the amended appropriations Act on the ground that it impairs the obligation of their

contracts, Regents is not in position to argue that its impairment was justified (i.e., Regents is not in position to enumerate as error the trial court's ruling that the amended appropriations Act is unconstitutional in that it impairs the obligations of its contracts, and then complain when it prevails on that enumeration).

*Motion for rehearing denied. All the Justices concur, except Jordan and Hall, JJ., who dissent.*