J. L. and J. R., minors, individually and as representatives of a class consisting of all persons younger than 18 years of age, now or hereafter received by any defendant for observation or diagnosis and/or detained for care or treatment at any facility within the State of Georgia, pursuant to 1969 Georgia Laws pp. 505–517, informally codified as Georgia Code Annotated § 88–503.1, Plaintiffs,

v.

James PARHAM, Individually and as Commissioner of the Department of Human Resources, et al., Defendants.

Civ. A. No. 75–163–Mac

United States District Court,
M. D. Georgia,
Macon Division.

March 17, 1976.

David Goren, Georgia Legal Services Program, Macon, Ga., for plaintiffs.

R. Douglas Lackey, Asst. Atty. Gen., Atlanta, Ga., for defendants.

Before MORGAN, Circuit Judge, BOOTLE, Senior District Judge and OWENS, District Judge.

Defendants Parham, Skelton and Smith, individually and as officials of the Department of Human Resources of the State of Georgia, have moved this district court of

three judges[1] to stay its entire order of February 26, 1976, and the judgment entered March 11, 1976, pending their appeal to the Supreme Court of the United States. For grounds they urge:

"1. A stay is necessary in order to maintain the *status quo* and to prevent the issues from becoming moot during the appeal.

"2. A stay is necessary in order to protect the public interest during the appeal of the court's order.

"3. A stay is necessary in order to prevent irreparable injury to the members of the *plaintiff* class during the appeal of the court's decision."

Defendants' motion filed on March 10, 1976, was heard on March 11, 1976. Evidence presented and arguments read and heard having been considered, this constitutes the court's order on defendants' motion.

■ The defendants by brief and in argument suggest that they satisfy the four criteria which traditionally are considered by trial courts in deciding whether or not to grant a stay pending appeal, to wit: "(1) the applicant must establish a strong likelihood of success on the merits; (2) the applicant must show that he will be irreparably harmed if the stay is not granted; (3) the applicant must show that the other party will not be irreparably harmed by a stay; and (4) the applicant must show that the public interest will be served by the stay." Defendants' brief in support of motion.

■ The defendants first concede the obvious—this district court of three judges would not have unanimously decided that children cannot be voluntarily committed and detained in Georgia's mental hospitals pursuant to this statute which contains absolutely *no* due process protection, if it were

of the opinion that on appeal the defendants are likely to convince a majority of the Supreme Court to hold to the contrary. Having so conceded, defendants suggest that nevertheless this is a new, novel issue similar to *Kremens v. Bartley*, 402 F.Supp. 1039 (E.D.Pa.1975), which was stayed by the Supreme Court on December 15, 1975, and that said stay is a signal that they may indeed prevail upon appeal.

The court secured a copy of the motion for a stay in *Kremens* as considered and granted by the Supreme Court and again read the decision that was being appealed. *Kremens*, it is first noted, considers whether or not a statutory procedure and regulations pertaining thereto which collectively contain some due process type protection for children, described in the dissent of Judge Broderick as follows:

"Under the Pennsylvania Act and regulations, application for voluntary admission or commitment to a facility may be made by a parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years or younger. In order to be admitted or committed to an institution, any person aged 18 and younger must first be referred from a recognized medical facility, Mental Health/Mental Retardation therapist or Mental Health Agency. Such referral must be accomplished by a psychiatric evaluation and a report which states with specificity the reasons that the child requires institutional care. After such referral, the director of the facility to which the parents seek to have their child admitted must then conduct an independent examination of the child in order to determine whether the child is in need of institutional care or observation. If the director's independent examination disagrees with the referring professional's opinion, the child cannot be institutional-

---

1. This court as originally constituted consisted of Circuit Judge Bell, Senior District Judge Bootle and District Judge Owens. Following the court's decision of February 26, 1976, Circuit Judge Bell's resignation became effective on March 1, 1976. Upon notification of the intention of the defendants to file this motion the court was reconstituted by Chief Judge Brown to consist of Circuit Judge Morgan, Senior District Judge Bootle and District Judge Owens.

ized. In the case of a voluntary commitment under § 403 of the Act, an acceptance for commitment may not exceed thirty days without a successive application for continued voluntary commitment for an additional thirty day period. In the case of juveniles 13 years of age and older, within 24 hours of admission to the institution, the juvenile must be given written notification which he signs and which is to be fully explained to him and which states that he will be furnished with counsel to represent him. Should a juvenile who is 13 years of age or older object, either orally or in writing, to remaining in the institution, the director, if he feels it is necessary for the youth to remain, may continue the institutionalization for two business days, during which time notification shall be made to the applicant and the referral unit so that either party may institute a § 406 proceeding, which is the statutorily required court hearing for an involuntary commitment. During that same two day period, the director must obtain counsel to represent the juvenile. The juvenile's counsel is then furnished with the evaluation of the juvenile by the referral unit, a psychiatric evaluation from the institution, and a written report of the reasons that the institution feels that institutionalization is required.

"The effect of the Act and the regulations promulgated thereunder is that two independent medical opinions must concur in a recommendation of institutionalization before a minor can be voluntarily admitted. In the case of juveniles 13 and over, upon their objections to remaining in the institution, future institutionalization must proceed pursuant to the civil court commitment provisions of the Act. (Section 406). Section 406 provides the procedure for an involuntary civil court commitment and requires the filing of a petition with the Court of Common Pleas, pursuant to which the Court issues a warrant requiring the allegedly ill person to be brought to Court for a hearing. Counsel appointed for the juvenile represents him at the hearing before the Court of Common Pleas. After the hearing, the Court may order an examination by two physicians or order commitment for a period not to exceed ten days for an examination, after which commitment may be ordered by the Court. Plaintiffs do not attack the constitutionality of the civil court commitments under § 406 of the Act which follow the above outlined procedure." (footnotes omitted). *Kremens, supra*, dissent of Judge Broderick, pp. 1054–1055.

meets due process requirements. The *Kremens* court decided that these protections are constitutionally inadequate and went further to decide in minute detail what protections are required. Having spelled out every detail the court as to thousands of children in both mental health and mental retardation facilities in Pennsylvania gave the defendants 120 days to initiate and complete recommitment or discharge procedures. Unlike *Kremens* the decision of this court is only that some due process protection is required for children to be voluntarily committed to a mental hospital. Unlike *Kremens* this court's order requires that as to only those 154 children (Dr. Skelton's affidavit in support of motion) who were in defendants' custody on January 31, 1976, proceedings be just commenced—not commenced and completed—in one of Georgia's 159 juvenile courts or one of Georgia's 159 courts of Ordinary within 60 days from the court's order of February 26, 1976. In chambers on January 8, 1976, the defendants were advised that the court's order would allow this 60 day period so in reality they have had an additional 48 days within which to commence such proceedings. Since Georgia's juvenile court system in fiscal year 1974 disposed of 48,116[2] juvenile cases, 154 additional cases scattered throughout this entire state and commenced over a sixty day period should not create an extraordinary problem for the fine juvenile

2. Second Annual Report, Administrative Office of the Courts of Georgia.

court system that we have in this state. That *Kremens* and its particular facts demonstrated a crying need for a stay does not in any way indicate a similar crying need in this case the facts of which are totally different.

■ To demonstrate irreparable harm to the defendants they assert that while they as state officials will not be harmed, the people who are served by the State's mental health program will be harmed by the monetary cuts that will have to be made in some services to fund the creation and operation of nonhospital facilities ordered by the court. As the Supreme Court of Georgia reminded all state officials on December 4, 1975, in the case of *Busbee v. Georgia Conference, American Association of University Professors*, 235 Ga. 752, 221 S.E.2d 437 (1975), even the failure of the legislature of this state to appropriate money for a particular purpose does not lessen the legal obligation of state officials to perform their lawful duties using money available for other purposes.

While the defendants did confer with the governor and legislative leaders in January 1976 in response to the court's request that they do so and while Dr. Skelton's affidavit shows that they then said funds were unavailable because they among other things, were of the "opinion that the regional hospitals were offering appropriate treatment for children" (February 26 Order at 18), it now appears that the defendants between February 26, 1976, and the adoption of a final budget about a week later did not request the legislature or the governor to appropriate money to cure and correct the admitted inappropriate treatment of a large number of plaintiff children. Defendants

say to even make such a request would be a futile effort. Until such time as *each* representative and senator and the governor of this state—all fathers and grandfathers like the judges of this court—have been told of the facts of this case and presented with a formal request for such funds and until such time as they have formally denied such funds, this court will not accept defendants' contention that it would be futile to make such a request. Having elected to refrain from communicating with the legislature, defendant state officials can decide[3] for themselves how to go about shifting funds to comply with the court's order.

While they steadfastly refuse to so admit, their failure to request funds could be due to their agreement with this court's opinion that the creation and operation of appropriate non-hospital facilities for these children in reality will save rather than cost money, i. e. hospital care costs some $40,000 per year per child whereas group home care costs some $7,500 per year per child; residential treatment care centers cost $12,000 per year per child.

As the evidence shows, the defendants agree that less stringent, non-hospital facilities are needed and are more appropriate but they want to provide them when they deem it advisable to do so, not when this court orders them to do so. To be compelled to do what admittedly should be done is not to be harmed.

Defendants say that plaintiff minor children are being harmed by the court's present order because that order is setting priorities for the Department of Human Resources. "As an alternative to allowing the court to set priorities for the Department, the Department *can and will simply*

---

3. The defendants are reminded that the Supreme Court declined to hear the plea they are now making in *Department of Human Resources v. Burnham*, 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709, 43 U.S.L.W. 3683 (1975), *denying cert. to* 503 F.2d 1319 (5th Cir.). In that case, one of the questions presented in the petition for certiorari was:

"Can federal district court, consistent with Eleventh Amendment, entertain suit by pri-

vate individuals that would require state to re-order its priorities and increase its level of fiscal support for therapeutic or curative psychiatric treatment it provides in its mental institutions?"

43 U.S.L.W. 3459 (U.S. Feb. 18, 1975) (No. 74–904).

*relinquish custody* of the 46 children to the persons who placed the children with the Department." They would thus be deprived of their present care and treatment. A stay would prevent this harm and permit their present care and treatment to continue. Thus they conclude that a stay would help rather than hurt these children.

Implicit in this court's February 26, 1976, order is the court's considered opinion that every minute of unnecessary or inappropriate confinement and detention of a child in a mental hospital is a deprivation of liberty which affects him adversely and from the harmful effects of which he may never recover. That considered judgment has not changed.

The defendants go on to say that the public interest will be served by a stay because it is in the public interest to encourage and make it easy to admit children to mental hospitals rather than discouraging their admittance by requiring an adversarial juvenile court hearing. They also say it is in the public interest to not burden Georgia's juvenile court system with mentally ill children.

The evidence shows that in spite of requested permission to do so, defendants between January 8 and February 26, 1976, did not apprise their employees that they were expecting an adverse ruling and that it would soon be necessary to either petition juvenile court or assist parents in petitioning a juvenile court to admit children in need of treatment. The confusion that defendants say exists, the reported reluctance of some parents to process their children through juvenile court, results from a total lack of effort on defendants' part to prepare their employees to communicate with parents and juvenile courts and to implement the order that they had been told was coming. Any parent who sincerely believes that his child is mentally ill and in need of treatment will not hesitate to have his child civilly committed through juvenile court or any other court process. Proof of this is that according to the defendants 1,111 children were involuntarily court committed

during the fiscal years 1969 through 1976. Order of February 26, 1976 at 119–120.

The legislature of this state after careful study enacted an already described completely revised Juvenile Court Code in 1971. That code provided then and provides now for children who are mentally ill. 1933 Ga.Code Ann. §§ 24A–301 and 2601. That code contains already mentioned due process safeguards. To begin to utilize this revised juvenile court code for mentally ill children will be only to do in 1976 what the legislature of this state provided to be done beginning in 1971. The total of 22 children defendants estimate will be the subject each month of juvenile court proceedings will be a small addition to the said 48,116 juvenile cases handled on a yearly basis in Georgia's juvenile courts.

The State is being required to utilize an existing court system and to create non-hospital facilities that they themselves say they need and eventually want. Neither the utilization of juvenile courts nor the creation of such needed, wanted facilities will moot the issues upon appeal because if defendants prevail upon appeal, they will be free to return to the statutory system still deemed by this court to be violative of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. *Allee v. Medrano*, 416 U.S. 802, 811, 94 S.Ct. 2191, 2198, 40 L.Ed.2d 566, 578, to wit:

"It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants 'would be free to return to "[their] old ways."' *Gray v. Sanders*, 372 U.S. 368, 376, 83 S.Ct. 801, 806, 9 L.Ed.2d 821; *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29; *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303; *NLRB v. Raytheon Co.*, 398 U.S. 25, 27, 90 S.Ct. 1547, 1548, 26 L.Ed.2d 21; *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 406, 92 S.Ct. 577, 579, 30 L.Ed.2d 560. . . ."

146

Defendants' arguments presented and considered are essentially a restatement of contentions made before the court issued its February 26, 1976, order. Then and now they have been considered and found wanting.

It is therefore the carefully considered judgment of this court that it is in the best interest of the plaintiff minor children that defendants' motion to stay pending appeal is denied.